COMMONWEALTH vs. WILLIAM R. BURT
(and three companion cases[1]).

Suffolk. October 2, 1984. — January 22, 1985.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Practice, Criminal,* Dismissal. *Search and Seizure,* Probable cause, Affidavit, Warrant, Multiple occupancy structure. *Constitutional Law,* Search and seizure. *Probable Cause.*

A Municipal Court judge acted properly in dismissing criminal complaints against four defendants following their indictment on identical charges by a grand jury. [705-707]

Affidavits which set forth information furnished to a security officer of the Boston traffic and parking department by an identified private citizen, and which described the observations made by that officer in the course of his own investigation as well as other observations by police investigators, made a sufficient showing of probable cause to believe that four parking meter collectors had been engaged over a protracted period in the theft of coins from parking meters, and supported the issuance of warrants for the arrest of the four individuals and the search of their residences and automobiles. [707-715]

Affidavits in support of warrants for the search of residences and automobiles of four parking meter collectors provided sufficient nexus between the places to be searched and the items sought to be seized in an investigation of the collectors' alleged theft of parking meter receipts. [715-716]

A finding of probable cause was not precluded by staleness of the information contained in an affidavit based on police observations over a five-month period and describing an ongoing operation for the theft of parking meter receipts. [716]

A warrant describing premises to be searched as a single-family dwelling, when in fact the premises were within a two-family dwelling, was not invalid on its face, where the police officers who applied for and executed the warrant did not know or have reason to know that the building concerned was not a single-family dwelling and where there were no circumstances to put them on notice to inquire whether it was a single-family dwelling. [717-718]

A warrant for search of a defendant's residence was not deficient by reason of the fact that it was on a form authorizing the search of a motor vehicle,

[1] Robert Rocha, Daniel J. Sullivan, and Ralph F. Voto.

where it otherwise met constitutional and statutory requirements and
where portions of the warrant pertaining to a motor vehicle were super-
fluous and created little danger of confusion. [718-719]

Warrants for the search of a certain safe and safe deposit boxes were adequate
even though one or more of them may have contained an incorrect stat-
utory citation. [719]

INDICTMENTS found and returned in the Superior Court De-
partment on August 5, 1982.

Motions to dismiss and to suppress evidence were heard by
*John F. Moriarty, J.*

An application for an interlocutory appeal was granted by
*Liacos, J.,* in the Supreme Judicial Court for the county of
Suffolk, and the cases were reported by him.

*Anthony M. Traini* for William R. Burt & others.

*William F. Spallina* for Daniel J. Sullivan.

*Judy G. Zeprun,* Assistant District Attorney (*Michael J.
Traft & William T. Walsh,* Assistant District Attorneys, with
her) for the Commonwealth.

LIACOS, J. The defendants, and three others not parties to
this appeal, were arrested on July 6, 1982, pursuant to arrest
warrants. Also, on July 6 and 7, 1982, Sergeant Detective
Robert F. Ryan of the Boston police department obtained, and
had executed, warrants to search the defendants' homes, their
automobiles, a safe, and certain safe deposit boxes. The defend-
ants were charged in the Municipal Court of the City of Boston
on complaints of larceny in excess of $100. G. L. c. 266,
§ 30. They were arraigned in the Municipal Court on July 7,
1982, and their cases were continued for trial to August 9, 1982.

Meanwhile, on August 5, 1982, the Suffolk County grand
jury returned indictments charging the defendants with larceny
in excess of $100 and with conspiracy to commit larceny. The
prosecutor advised counsel for the defendants that he would
seek to dismiss the complaints in the Boston Municipal Court
(hereinafter, District Court) on the ground that the grand jury
had indicted each defendant on identical charges. On August
11, 1982, the District Court judge allowed the Common-
wealth's motion to dismiss, and that same day the defendants

were arraigned in the Superior Court. They stood mute, and the judge ordered pleas of not guilty to be entered.

The defendants filed motions to suppress evidence seized pursuant to the search warrants.[2] They also filed a motion to dismiss the indictments on the ground that the District Court judge improperly had allowed the Commonwealth's motion to dismiss the complaints.[3] The Superior Court judge denied the motions.

The defendants filed a petition for leave to prosecute an interlocutory appeal of the judge's denial of their motions to suppress, pursuant to Mass. R. Crim. P. 15 (b) (2), 378 Mass. 882 (1979), and for leave to appeal from the denial of their motion to dismiss the indictments under G. L. c. 211, § 3. A single justice of this court allowed their petition under rule 15 (b) (2), and granted their petition for leave to appeal under G. L. c. 211, § 3, inasmuch as the defendants would be before this court on appeal from the denial of their motions to suppress. We affirm the judge's rulings.

1. *Motion to dismiss.* We consider first the defendants' contention that the District Court judge improperly dismissed the complaints brought in the District Court when he failed to exercise any discretion in allowing the Commonwealth's motion to dismiss.[4] They argue that the judge had discretion under

---

[2] Edward J. Coffey did not file a motion to suppress and is not a party to this appeal. Another codefendant, Ronald A. DeSimone, filed a motion to suppress which was allowed, and he is therefore not a party to this appeal.

[3] Originally, only Fred J. Girolamo filed a motion to dismiss. He had been initially a party to this appeal. He has, however, pleaded guilty to the charge of larceny, and his appeal has been dismissed on the Commonwealth's motion, to which he assented. The Superior Court judge allowed Burt, Rocha, Sullivan, and Voto to join his motion, and hence we consider their appeal on this point.

[4] The Commonwealth contends that the defendants have no right to review of the District Court judge's ruling. It argues further that, since the defendants argue error by the District Court only, they have waived this issue with reference to the ruling of the Superior Court. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). The Superior Court judge had the power to review the propriety of the District Court judge's ruling. *Commonwealth* v. *Zannino*, 17 Mass. App. Ct. 73, 75-76 (1983). In reviewing the ruling of the Superior Court judge, we review the actions of the District Court

Mass. R. Crim. P. 3, 378 Mass. 847 (1979), to weigh the merits of the motion. They urge this court to reinstate the District Court complaints and to dismiss with prejudice the duplicative indictments in the Superior Court.

In granting the Commonwealth's motion to dismiss, the District Court judge relied on *Commonwealth* v. *Raposa,* 386 Mass. 666 (1982). In *Raposa,* the defendants were arraigned in a District Court, and a trial date was set. Prior to the expiration of a continuance, a grand jury indicted the defendants on identical charges. The prosecutor moved to dismiss the complaints in the District Court. The motion was denied. The defendants then were arraigned in the Superior Court. Subsequently, the prosecutor filed a nolle prosequi in the District Court, and, on the day of trial, the prosecutor nol prossed the cases in open court.

We held that the Court Reorganization Act, St. 1978, c. 478,[5] did not alter the power of a prosecutor to seek indictments while identical charges are pending in the District Court and then to nol pros the case in a District Court. *Id.* at 668. We held further that the actions of the prosecutor, described above, were not an affront to the court which required reprimand. *Id.* at 668 n.6. Cf. *Commonwealth* v. *Thomas,* 353 Mass. 429 (1967).

We conclude that, given the procedural posture of the cases before him, the District Court judge acted properly. Should the District Court judge have denied the Commonwealth's motion, the Commonwealth simply could have proceeded to nol pros the cases. In *Raposa,* the Commonwealth took precisely that action, which we upheld. The District Court judge took the

judge on the same record. Although we give deference to the conclusions of the Superior Court judge, his conclusions are entitled to no special weight in the appellate process. See *Commonwealth* v. *Balliro,* 385 Mass. 618, 622 (1982). Hence, we, as did the Superior Court judge, consider the question of the propriety of the District Court judge's ruling on the Commonwealth's motion to dismiss in the District Court.

[5] Statute 1978, c. 478, § 187, codified as G. L. c. 218, § 26, gave the District Court concurrent jurisdiction with the Superior Court over a variety of offenses including all misdemeanors, except libels, and all felonies punishable by imprisonment in the State prison for not more than five years.

proper course and allowed the Commonwealth's motion. Cf. *Commonwealth* v. *Brandano*, 359 Mass. 332, 335 (1971). There is no error.[6]

2. *Motions to suppress*. A. *Probable cause*. Each of the defendants argues, first, that the warrants for their arrests were issued improperly, in that the judge who issued the warrants relied on affidavits which did not provide a sufficient basis for finding probable cause that the defendants had engaged, or were engaged, in theft of parking meter revenues. The defendants also argue that the judge lacked probable cause to issue warrants authorizing searches of their residences and motor vehicles. They contend, in particular, that (1) the observations described in the affidavits were insufficient to support probable cause; (2) there was insufficient nexus between the information in the affidavits to support the searches of their residences; and (3) the staleness of information in the affidavits rendered the searches unreasonable.

Additionally, the defendant Rocha argues that, under the fruit-of-the-poisonous-tree doctrine, the judge lacked the requisite probable cause to authorize searches of two safe deposit boxes and a safe.

The warrants for the defendants' arrests and for the searches of their residences and motor vehicles were issued on the basis of affidavits signed by Sergeant Ryan. We set forth some of the facts contained in his affidavits.

The investigation which led to the issuance of the warrants began on May 25, 1982, when Sergeant Ryan met with Joseph McDonald, a security officer of the Boston traffic and parking

---

[6] We are mindful of the additional finding in *Raposa* that the prosecutor's behavior was not an affront to the District Court. We agree with the Superior Court judge that this is not a case like *Commonwealth* v. *Thomas, supra*. In the instant case, there was no threat or evidence "of any desire to intrude on the prerogatives of the judge." *Commonwealth* v. *Hinterleitner*, 391 Mass. 679, 683 (1984). Furthermore, in *Thomas, supra* at 431-432, we based our ruling not only on the act of effrontery but on a violation of the defendant's constitutional right to a speedy trial. Thus, we left open the question whether an affront to the District Court requires a dismissal of subsequent indictments. *Hinterleitner, supra*. In the instant cases, the defendants do not contend that their right to a speedy trial was violated by the dismissal and subsequent arraignment.

department. McDonald told Sergeant Ryan that he had received information from an unnamed, though reliable, source that eight or nine parking meter collectors employed by his department were involved in a continuing scheme of larceny of coins from parking meters. The estimated revenue loss to the city of Boston amounted to several hundred thousand dollars a year.

McDonald also told Sergeant Ryan that on April 15, 1982, he had been approached on the street by a man who identified himself as Scott Stephens and gave a Boston address. Stephens told him that on a Thursday during the first or second week of March he had observed two meter collectors in a red Chevrolet station wagon, bearing the traffic department logo and registration M20475, parked on Boylston Street in the Fenway area. As he walked by, Stephens noticed the driver using a cup to empty quarters from a small bag into a larger bag. Stephens confronted the two men and warned them that, if they did not empty the quarters into the "strong box" which collectors carry for that purpose, he would turn them in. The two men then dumped the quarters from the small and larger bags into the strong box. Stephens waited until they had completed the task and then left the area.

McDonald told Sergeant Ryan that, after he had heard Stephens's story, he undertook his own investigation. On May 17, 1982, McDonald observed Fred J. Girolamo, a traffic department employee, carrying a brown paper bag, concealed under a traffic department shirt, from a traffic department vehicle to the trunk of a red Oldsmobile automobile parked on the street. Girolamo placed the bag in the trunk, closed the trunk, and returned to the traffic department vehicle. The traffic department vehicle was driven by defendant Voto, another department employee. Later the same day, McDonald saw Girolamo carrying a white bag from a traffic department vehicle, through a vacant parking lot, to the same red Oldsmobile automobile.[7] He saw Girolamo put the bag on the floor of the automobile and cover it with a white cloth. After Girolamo was gone, McDonald looked in the automobile through the

[7] Registration of the vehicle is listed to Girolamo.

window and saw a white bag on the floor covered with a handkerchief. The bag was bulging and so tightly packed that he saw the imprint of a round item about the size of a quarter against the side of the bag.

McDonald informed Sergeant Ryan that a number of employees of the traffic department were believed to be involved in the theft, including the defendants. McDonald told Sergeant Ryan that the traffic department meter collectors work in pairs, one person as driver and the other as collector. The pairings rotate from time to time. The collection team travels in a red traffic department station wagon with a large, sealed and locked metal canister, or "strong box." The parking meters are adapted to fit the strong box and to empty the contents without the collector touching the coins. The drivers and collectors are prohibited from carrying coins out of the locked canister and from making stops at motor vehicles during the work day. The traffic department provides its employees with a cost-free parking area at 112 Southhampton Street, next to the traffic department building.

After receiving McDonald's information, Sergeant Ryan undertook his own investigation from May 26, 1982, through July 2, 1982. We shall set forth his statements, as shown in the applications for the warrants, later in the course of our discussion.

We conclude that there was probable cause to support the issuance of arrest and search warrants for all the defendants. We reach our conclusions under the more stringent test set forth in *Aguilar* v. *Texas,* 378 U.S. 108 (1964), and *Spinelli* v. *United States,* 393 U.S. 410 (1969), as interpreted by our own cases.[8] See *Illinois* v. *Gates,* 426 U.S. 213 (1983), for discussion of the less stringent "totality of circumstances" test.

---

[8] We need not consider, therefore, the less stringent test established in *Illinois* v. *Gates,* 462 U.S. 213 (1983), nor defer review pending our decision in *Commonwealth* v. *Upton,* 390 Mass. 562 (1983), rev'd and remanded, 466 U.S. 727 (1984). We have *Upton* under advisement. *Upton,* on remand, raises the issue of the appropriate State standards to be applied under State law in reviewing a magistrate's determination of probable cause. We note that the defendants did not raise questions of the appropriate standard of probable cause under State law before the motion judge.

The test set forth in *Aguilar* and in *Spinelli* requires that an anonymous informant's trustworthiness be demonstrated before there can be a finding of probable cause based on information the informant supplies. This court and others have drawn a distinction, however, between the type of anonymous informants involved in *Aguilar* and in *Spinelli* and other citizens who supply police officers with information including witness-bystanders, victims, and participants in the crime. See *Commonwealth* v. *Aarhus,* 387 Mass. 735, 744 (1982) (distinction between victim's husband and an unnamed informant); *Commonwealth* v. *Bowden,* 379 Mass. 472, 477 (1980) ("the cab driver was not an 'informant,' but was instead an ordinary citizen"); *Commonwealth* v. *Martin,* 6 Mass. App. Ct. 624, 627 (1978) (apparently disinterested young girls are not "faceless informers"); *United States* v. *Campbell,* 732 F.2d 1017, 1019 (1st Cir. 1984) (the informant "was not a professional informant, but a private citizen with no known criminal record or other criminal contacts, who came forward on his own"); *United States* v. *Melvin,* 596 F.2d 492, 497 (1st Cir. 1979) ("the 'unknown male' was a bystander witness, not an informant"); *United States* v. *Rueda,* 549 F.2d 865, 869 (2d Cir. 1977) ("informant . . . [was] a participant in the very crime at issue"); *United States* v. *Burke,* 517 F.2d 377, 380 (2d Cir. 1975) (distinction between professional informers and an alleged victim of, or witness to, a crime). We have relaxed the requirement of known reliability for a witness of a crime, see *Bowden, supra,* and for a named and identified informant, see *Commonwealth* v. *Atchue, ante* 343 (1984).

Neither Stephens nor McDonald was an anonymous tipster. Stephens provided his full name and address and gave a detailed account of his encounter with traffic department employees. McDonald, a security officer for the traffic department, also gave a detailed report of his personal investigation. Furthermore, the affiant, Sergeant Ryan, had the opportunity to question McDonald. Cf. *Commonwealth* v. *Fleurant,* 2 Mass. App. Ct. 250, 253 (1974) (the affiant's occasion to question the informant may be considered in assessing credibility). The issuing judge had a "substantial basis" for crediting the hearsay.

See *Commonwealth* v. *Stevens,* 362 Mass. 24, 27 (1972). This basis arose from the details and circumstances of the observations of Stephens and McDonald, and in the corroborating information gathered by Sergeant Ryan. The judge who issued the warrants was entitled to accept the statements of Stephens and McDonald.

There was, however, also an anonymous tip as to the larcenous scheme. The defendants contend that this information came from an unnamed and unreliable source, and should not have been considered in assessing probable cause. Although the tip in itself was deficient, it could be credited because it was corroborated by observations by police officers. See *Commonwealth* v. *Franklin,* 376 Mass. 885, 898-899 (1978); *Commonwealth* v. *Stevens, supra.* "A tip in itself inadequate may be fortified through corroboration of its elements by means of police investigation." *Commonwealth* v. *Kaufman,* 381 Mass. 301, 303 (1980), citing *Commonwealth* v. *Vynorius,* 369 Mass. 17, 20 (1975), and *Commonwealth* v. *Anderson,* 362 Mass. 74, 76 (1972). The corroborating observations made of each defendant by police officers were as follows.

(1) *Voto.* On June 3, during working hours, police detectives observed traffic collector Girolamo transferring a heavy object wrapped in a shirt from the traffic department vehicle to his own vehicle. Voto was driving the traffic department vehicle. Sergeant Ryan's detectives made similar observations of Voto and Girolamo on June 14 and twice on June 18.[9]

On June 3, after the object was transferred to Girolamo's vehicle at about 3:30 P.M., Girolamo and Voto were seen returning in Voto's vehicle to the Girolamo vehicle on Cummings Street at about 4:25 P.M. Voto stopped his vehicle next to Girolamo's vehicle. Girolamo got out and transferred an object from his own vehicle to the floor on the passenger's side of Voto's vehicle. Voto then drove away. At about 6 P.M. the same day, Voto was seen arriving in his vehicle at his home at 106 Marginal Street in East Boston. Voto got out of

___

[9] On two occasions on May 17, McDonald had made similar observations of Girolamo and Voto.

the vehicle carrying a package with both hands and entered the house.

On June 18, after having made two transfers of heavy objects from the traffic department vehicle to Girolamo's vehicle during working hours, Voto and Girolamo returned in Voto's vehicle to Girolamo's vehicle at about 4:25 P.M. At that time, Girolamo removed a package from the trunk of his vehicle and put it into the trunk of Voto's vehicle.

On June 22, 24, and 30, Voto was seen riding in a red traffic department vehicle driven by Edward J. Coffey, another traffic department employee. On each of those occasions, Coffey's vehicle had been seen parked on Island Street. On each of these three occasions, Coffey was observed leaving the traffic department vehicle carrying a package and placing it in the rear of his own vehicle. On one of these occasions, June 30, the package was wrapped in a blue work shirt.

(2) *Burt*. The investigating officers saw Burt on numerous occasions from June 1, 1982, through June 16, 1982. On June 1, 2, and 4, the officers observed a similar pattern in Burt's conduct: Burt removed a wrapped bundle from a traffic department vehicle and placed it in the private motor vehicle of Coffey. Coffey's vehicle was not parked in the traffic department parking lot, but rather was parked nearby on Island Street. On June 4, 7, and 8, the officers saw Burt transferring packages from Coffey's vehicle to his own, and then later carrying packages from his vehicle into his home. Burt was also seen on June 14 and 15 transferring a package from the private vehicle of another collector to his own vehicle, and on June 16 was seen moving a heavy package from a traffic department vehicle to his own vehicle.

(3) *Sullivan*. The investigating officers observed Sullivan on numerous occasions from June 9, 1982, through July 1, 1982. On June 9 after about 4:15 P.M. while in the traffic department parking lot, Burt was seen transferring a package wrapped in newspaper from Coffey's vehicle to Sullivan's vehicle. Sullivan and Burt then left the parking lot in Sullivan's vehicle and drove to a location on Washington Street where Burt removed some packages from the trunk, wrapped them in

jackets, and carried them into a building. At the same time, Sullivan removed a package from the trunk, placed it on the front seat of his vehicle, and left the area.

On June 15, the officers found a vehicle registered to Sullivan parked on Island Street. At about 3:50 P.M., they saw Sullivan arriving at that location in a traffic department vehicle and watched him transferring a heavy object wrapped in a light-colored cloth from the traffic department vehicle to his own vehicle. He returned again at about 4:05 P.M., as a passenger in Burt's vehicle, removed an object from his vehicle, and handed it to Burt, who placed it in Burt's vehicle. Sullivan was then followed by the surveillant officers to his home in Sharon where he was observed entering his home carrying "a large package" in his left hand.

On June 23, the officers found Sullivan's vehicle parked on Fellows Street. At about 11:18 A.M., Sullivan arrived at his vehicle as a passenger in a traffic department vehicle. With both hands, he carried a bundle wrapped in a blue cloth from the traffic department vehicle and put it in his own vehicle. The surveillant officers observed a similar course of events on June 24, June 25, June 30, and July 1. On each occasion, Sullivan arrived with another collector in a traffic department vehicle at his own vehicle parked on Fellows Street. Sullivan got out of the traffic department vehicle, removed a package, and placed it in his own vehicle. The package appeared to be quite heavy on several occasions, and on June 30 was wrapped in a blue cloth.

(4) *Rocha.* Rocha was seen by Sergeant Ryan's officers on two separate occasions on June 14, 1982. First, at about 3:15 P.M., the officers saw Rocha leaving a traffic department vehicle in the vicinity of the traffic department parking lot and carrying what appeared to be a heavy package wrapped in a blue shirt. He walked to his own vehicle, which was parked in a neighboring parking lot. Rocha then placed the package in the vehicle.

Also on June 14, another officer saw Rocha leaving the traffic department building with defendant Burt and two other traffic collectors. The four collectors went to Girolamo's vehi-

cle, from which each of them removed a package. Each carried his package to his respective vehicle.

While searching Rocha's vehicle pursuant to the warrant, the officers found a key ring with two safe deposit box keys. In searching his house they found a Sentry safe, which they seized. The officers applied for, and obtained; warrants to search the two safe deposit boxes, No. 191 and No. 238. No. 191 was listed in the Rocha name at the First National Bank for Savings in Stoughton, and No. 238 was listed under another name at the bank. The search of No. 191 uncovered various documents, plus $72,760 in cash. The key marked No. 238 did not fit the box with the corresponding number, and so the second warrant was not executed.

The police officers also sought, and obtained, a warrant for the search of the Sentry safe. The search uncovered many documents and other items of property, including a safe deposit box key No. 238 contained in an envelope marked "Hancock Bank." The officers then sought, and obtained, a warrant to search that safe deposit box. The box was rented to Rocha and his wife. In it was found $66,260 in United States currency.

In analyzing the information contained in the warrants, we accept the reasonable inferences that a judge could draw as a common sense conclusion from the information set forth in the affidavit. See *Commonwealth* v. *Taglieri,* 378 Mass. 196, 199 (1979); *Commonwealth* v. *Alessio,* 377 Mass. 76, 82 (1979). See also *United States* v. *Ventresca,* 380 U.S. 102 (1965). The traffic department provided a free and conveniently located parking lot for its employees. Yet Burt, Sullivan, and Rocha parked their vehicles away from that free lot on at least one occasion. Meter collectors were forbidden by department policy from making stops with packages at private motor vehicles during the work day. Yet, all the defendants were seen stopping at their own, or another employee's, vehicle during working hours. These facts create some suspicion of the defendants' activities. This suspicion is strengthened by the furtive manner in which Burt, Sullivan, and Rocha transferred objects either from a traffic department vehicle or from another employee's vehicle to their own, or to another employee's, vehicle —

bundles were wrapped in blue shirts or jackets, newspapers, or pieces of cloth. Finally, the apparent heaviness of some of the packages, together with the information provided by Stephens, McDonald, and the unnamed informant, establish probable cause to believe that the defendants were engaged in the theft of coins from parking meters.

Although there were fewer observations made of Rocha than of the other defendants, at least one observation of him fit the pattern of the observations made of the other defendants. The observations of Rocha need not be assessed in isolation, but can be viewed in the context of the observations made of Rocha's fellow employees. "The sufficiency of [an] affidavit is to be decided on the basis of a consideration of all of its allegations as a whole, and not by first dissecting it and then subjecting each resulting fragment to a hypertechnical test of its sufficiency standing alone." *Commonwealth* v. *Stewart,* 358 Mass. 747, 751 (1971). See also *United States* v. *Fooladi,* 703 F.2d 180, 184 (5th Cir. 1983) ("we do not consider each individual item of information separately; we evaluate the 'laminated total' of available facts"); *United States* v. *Brown,* 584 F.2d 252, 256 (8th Cir. 1978) ("the issuing magistrate may properly rely on normal inferences drawn from the surrounding circumstances and allegations of fact as well as the type of the crime").

The defendants further argue that the affidavits fail to demonstrate the requisite nexus between the places to be searched, i.e., the defendants' homes and motor vehicles, and the items sought. An affidavit must contain enough information for the issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they may be expected reasonably to be found in the place to be searched. *Commonwealth* v. *Cefalo,* 381 Mass. 319, 328-329 (1980). A nexus between the items to be seized and the place to be searched need not be based on direct observation and may be found in "the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property." *Commonwealth* v. *Cinelli,* 389 Mass.

197, 213 (1983), quoting *United States* v. *Lucarz,* 430 F.2d 1051, 1055 (9th Cir. 1970). We believe that a sufficient nexus existed between the items to be seized and the defendants' motor vehicles and residences. All of the defendants were seen transferring packages to their own vehicles. Voto, Burt, and Sullivan were observed directly carrying packages into their homes. Given the pattern set by the others, the reasonable inference is that Rocha, too, brought packages into his home. In any event, the logical conclusion is that coins, tools, blue shirts, parking meter keys, and bank books might be located in the vehicles and residences of the alleged thieves.[10]

The defendants next argue that the staleness of the information contained in the affidavit precludes a finding of probable cause. Again, the principle applies that reasonable inferences may be drawn from an affidavit. "[W]here an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." *Commonwealth* v. *Vynorius,* 369 Mass. 17, 25 (1975), quoting *Bastida* v. *Henderson,* 487 F.2d 860, 864 (5th Cir. 1973). Here the affidavit described an ongoing criminal operation observed on numerous occasions over a five-month period. Unlike drugs, the items sought were not likely to be consumed or destroyed. Furthermore, because the hasty disposal of large amounts of coins could have been risky to the alleged thieves, the inference that some of the coins would be found in the defendants' residences and vehicles was reasonable.

We conclude that there was an ample showing of probable cause to sustain the issuance of each warrant.

---

[10] The defendants also argue that the affidavit does not provide sufficient information to establish probable cause that Voto, Sullivan, and Rocha actually resided at the residences to be searched. There were observations made of Sullivan and Voto actually entering the residences with packages. In addition, the affidavit states that these three defendants' vehicles were registered at the residences searched. As the judge noted, "[p]ersons usually reside at the addresses listed as their residences on their vehicle registrations."

B. *Validity of warrants*. We next address arguments made by three of the defendants that certain of the search warrants were facially defective.

(1) *Voto*. The warrant described Voto's home as "a 3 story single family green and white wooden building with front and rear access doors, located on Marginal Street known and numbered 106 in the East Boston section of Boston." This description was inaccurate because the building at 106 Marginal Street is, in fact, a two-family residence. Voto resides on the second floor; one Paul Miano occupies the first-floor apartment.

The house is a small, three-story wooden structure located at the corner of Marginal and Haynes Streets in East Boston. Two additions have been attached to the house — a single-story addition attached to the front of the building on Marginal Street (which is a separate apartment, numbered 104 Marginal Street) and a two-story addition attached to the rear of the building on Haynes Street. There are only two outside doors leading into the 106 Marginal Street building. The first is located on the front of the house and is numbered 106 Marginal Street; the second is located in the rear addition to the house and is numbered 51 Haynes Street. The door labeled 106 Marginal Street contains a single mail slot. There is nothing on either the door on Marginal Street or the door on Haynes Street to indicate that more than one family occupies that structure. The separate doors leading to each of the two apartments can be observed only after entering either of the outside doors.

The judge found that police officers had seen Voto and a female passenger, apparently his wife, arriving home in Voto's vehicle and had seen Voto using the front entrance and the woman using the rear entrance, to the house. He also found that police officers never saw anyone else entering or leaving the house.

We believe that the police officers who applied for and executed the warrant did not know, or have reason to know, before the search that the building was not a one-family dwelling.[11]

---

[11] While the record is unclear, the Commonwealth contends that the police officers only searched that portion of the premises in which Voto resided.

Therefore, the warrant is not defective for failure to specify a subunit within the named building. See 2 W. LaFave, Search and Seizure § 4.5, at 78-80 (1978). See also *Commonwealth* v. *Demogenes,* 14 Mass. App. Ct. 577, 581-582 (1982); *United States* v. *Rios,* 611 F.2d 1335, 1347 (10th Cir. 1979); *United States* v. *Santore,* 290 F.2d 51, 67 (2d Cir. 1960); *United States* v. *Parmenter,* 531 F. Supp. 975, 980-981 (D. Mass. 1982). Compare *Commonwealth* v. *Erickson,* 14 Mass. App. Ct. 501 (1982).

Voto argues that the police officers should have inquired whether the building was a single-family dwelling or a two-family dwelling before obtaining the search warrant. Because the building had all the appearances of a single-family dwelling, and because the police officers were not otherwise put on notice, there was no reason for them to so inquire. Their failure to inquire further was not unreasonable and, indeed, such inquiry could have jeopardized their investigation. See *Commonwealth* v. *Rugaber,* 369 Mass. 765, 769 (1976). Cf. *State* v. *Patmon,* 4 Kan. App. 2d 246 (1979).

(2) *Burt.* The warrant under which police officers searched Burt's residence was a form authorizing the search of a motor vehicle. The description inserted in the form, however, described the real estate to be searched.[12]

There was sufficient detail of the place to be searched to satisfy the requirements of the Fourth Amendment of the Constitution of the United States, art. 14 of the Massachusetts Declaration of Rights, and G. L. c. 276, § 2, that a particular description of the place to be searched appear in the warrant. *Commonwealth* v. *Pope,* 354 Mass. 625, 628-629 (1968). We

See *Commonwealth* v. *Lillis,* 349 Mass. 422, 425 (1965); *Commonwealth* v. *Demogenes,* 14 Mass. App. Ct. 577, 581-582 (1982).

[12] "We Therefore Command You in the daytime or the nightime to make a search of the interior, the glove compartment, the trunk and any other possible area of depository of a certain motor vehicle more particularly described as 8 Village Drive, Walpole Massachusetts, which is a wood framed; cream colored with brown trim 2 story raised single family ranch styled home with 3 access doors in the front side and rear, including an attached garage underneath the structure, owned and occupied by William R. Burt."

agree with the Superior Court judge that the terms pertaining to a motor vehicle were superfluous and created little danger of confusion. See *Commonwealth* v. *Von Utter,* 355 Mass. 597, 600 (1969). With regard to trivialities, such as the error at issue here, a conveyancer's precision of language is not to be expected. See *Commonwealth* v. *Pellier,* 362 Mass. 621, 624-625 (1972).

(3) *Rocha.* Rocha also challenges the facial validity of the search warrants used to search his safe and the safe deposit boxes. All these warrants were prepared on forms which began with the language: "Proof by Affidavit having been submitted this day before me by Sergeant Detective Robert F. Ryan that there is probable cause to believe that illicit monies or other proceeds of a criminal conspiracy to violate Massachusetts General Laws, Chapter *94C,* are being kept and concealed in . . ." (emphasis supplied). The Superior Court judge found that on all of the warrants before him the designation "94C" was crossed out in pen and ink and the designation "266 Sec. 30" inserted, with the initials "R.F.R." The judge was informed by Rocha's counsel, however, that, on the copy of the warrant for a search of safe deposit box No. 191 with which he was provided, no such change was made.[13]

We believe that the warrant was sufficient, even if it incorrectly stated the citation of the statute. Again, as we found with respect to the error in Burt's warrant, the misstatement is a triviality which can be ignored. See *Pellier, supra*; *Von Utter, supra*. A detailed description of the property to be seized is set forth immediately below the misstated statute. The executing officers were provided with a clear statement of the place to be searched and the articles for which to search. See *Pope, supra*.

---

[13] The prosecutor asserted that he was prepared to produce evidence to show that the change was overlooked at the time when the warrant for box No. 191 was originally issued, but that the oversight was noticed and corrected in the presence of the judge who issued the warrant before the warrant was executed. The prosecutor speculated that Rocha's counsel may have been mistakenly provided with a copy of the warrant before it was corrected and executed.

The rulings of the Superior Court as to the motions to dismiss and to suppress are affirmed. The cases are to stand for trial.

*So ordered.*