**UNITED STATES of America**

v.

**Jonathan LEGAULT and William Mondello**

**No. CRIM.03–10251–RGS.**

United States District Court, D. Massachusetts.

July 8, 2004.

Donald L. Cabell, United States Attorney's Office, Boston, MA, for USA Plaintiff.

Stephen D. Judge, Law Office of Stephen D. Judge, Lynn, MA, Frances L. Robinson, Davis, Robinson & White, LLP, Boston, MA, for Defendants.

## FINDINGS OF FACT AND RULINGS OF LAW ON DEFENDANTS' MOTION TO SUPPRESS EVIDENCE

STEARNS, District Judge.

On February 20, 2003, police officers assigned to the Essex County Drug Task Force searched an apartment on the second floor of a home located on Chestnut Street in Lynn, Massachusetts. The search was conducted pursuant to a warrant issued by a clerk-magistrate of the Lynn District Court. The search extended to the basement of the two-family dwelling. In defendant Jonathan Legault's bedroom, officers seized a Glock .40 caliber handgun, drugs, and drug par-

aphernalia.[1] In defendant William Mondello's bedroom, police seized drugs and a cocaine dilutant. In the basement, police found 358 grams of cocaine, drug paraphernalia, and four rounds of live .380 caliber ammunition. Defendants maintain: (1) that the warrant was facially defective in that it failed to describe the premises with sufficient particularity; (2) that police exceeded the authorized scope of the warrant by expanding the search to include the basement; (3) that the affidavit supporting the search warrant failed to establish probable cause; and (4) that the affiant knowingly or recklessly omitted information bearing on the credibility of the informant on whose information the showing of probable cause was based.

## FINDINGS OF FACT

1. On February 19, 2003, Lynn police arrested Tammy Spillane on several outstanding warrants. Spillane admitted that she was a drug addict and offered to lead police to her suppliers in exchange for a release from custody on personal recognizance. Sgt. Daniel Fee, the eventual affiant, spoke to the Presiding Justice of the Lynn District Court who stated that he would be inclined to a favorable bail determination if Spillane were to cooperate with police.

2. Spillane then stated that she bought her drugs from two men who shared a second floor apartment on Chestnut Street in Lynn. She gave descriptions of the men and was able to supply first names— "John" for the taller and younger of the two (her cocaine supplier), and "Billy" for the shorter and older (her pill supplier). Spillane admitted to making drug purchases at the apartment on dozens of occasions over the past eighteen months. She also said that while purchasing two "eight

---

1. A quantity of cocaine was also seized from    Legault's person.

balls" of cocaine and ten vicodin tablets with her boyfriend, Mack Peters, at the apartment the night before, "John" had shown Peters a handgun that he might be willing to hire out.

3. Spillane was then driven by two Task Force officers in an unmarked vehicle to Chestnut Street where she pointed out a two-family dwelling at number 280. By chance, the defendant John Legault was leaving the residence when the officers and Spillane arrived. The officers were able to get a good look at "John" as he drove by their vehicle. Spillane also pointed out an empty cookware carton in the curbside trash which, according to Spillane, had contained a cookware set that she had given the defendants the night before as a payment in kind for drugs. Sgt. Fee subsequently confirmed that a John Legault, who had an extensive record of arrests and convictions, including for drug and firearms offenses, lived in the second floor apartment at 280 Chestnut Street. He also located a police photo of Legault. Sgt. Fee observed that Legault matched Spillane's description. The two Task Force officers identified the photo of Legault as the "John" pointed out to them by Spillane.

4. Sgt. Fee then applied to a clerk-magistrate of the Lynn District Court for a search warrant. In his supporting affidavit, Sgt. Fee related Spillane's history of purchasing drugs from the defendants and the details of the purchase on February 18, 2003, when Spillane claimed to have seen the handgun. Sgt. Fee also described the field trip that Spillane had taken with Task Force officers to Chestnut Street, the fortuitous sightings of "John" and the discarded cookware box, the subsequent identification of John Legault, and the verification of his address and criminal record. The affidavit did not reveal any details about Spillane's own lengthy crimi-

nal record, the fact that she was then in custody, or that the Presiding Justice had promised leniency as a reward for her cooperation.

5. Sgt. Fee asked for and received a search warrant for the second floor apartment at 280 Chestnut Street with the authority to seize illegal drugs, drug paraphernalia, drug-related books, currency and papers, and any illegal firearms. The warrant did not authorize police to make a "no-knock" entry of the apartment.

6. The warrant was executed at 6:45 p.m. on February 20, 2003. Police initially attempted to persuade the defendants to open the apartment door by means of a ruse (claiming that they were investigating a "hang-up" 911 call). When the defendants responded with a sarcastic comment, the officers announced that they had a search warrant. Defendants responded with a profanity. After the officers heard running footsteps from inside the apartment, they used a battering ram to force entry.

7. Inside the apartment, police observed seven persons congregated in the living room. The apartment was equipped with an exterior video surveillance system, which monitored the apartment door and the back hallway. Legault emerged from the bathroom where he had just flushed the toilet. Mondello ran to his bedroom with police in pursuit and attempted unsuccessfully to lock himself behind the door.

8. After securing the occupants, police began the search. In Legault's bedroom, officers found a loaded Glock .40 caliber handgun hidden beneath a mattress together with a plastic bag containing 252 grams of marijuana. They also found sixteen methandrostenolone tablets, a quantity of psilocybin mushrooms, and four bottles containing anabolic steroids. Officers

also seized a small amount of cocaine from Legault's person.

9. In Mondello's bedroom, the officers seized six plastic bags containing 455 dihydrocodeinone/acetaminophen tablets, a plastic bag containing approximately four grams of marijuana, 13 oxycodone tablets, and a plastic bag containing seven grams of sodium bicarbonate.

10. Officers then proceeded to the unlocked basement door of the dwelling. On the landing of the basement stairs they found two cardboard boxes. Among the contents of the boxes were 358 grams of cocaine, a gallon can of acetone, a coffee grinder, assorted other drug paraphernalia, a plastic bag containing 292 grams of inositol, and another containing four live rounds of .380 caliber ammunition.

11. The two-family dwelling in which the apartment is located is jointly owned by Legault's mother and sister. The first floor apartment is occupied by Katherine Travers and two of her three children. Travers was the common-law wife of Legault's deceased brother.

## DISCUSSION AND RULINGS OF LAW

### The General Considerations

As the challenged search was conducted pursuant to a warrant, the burden falls to the defendants to show by a preponderance of the evidence that the search was unlawful.[2] *See United States v. Matlock,* 415 U.S. 164, 177–178 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). In the law of search and seizure there is a strong preference for the "informed and deliberate determinations of magistrates." *United States v. Lefkowitz,* 285 U.S. 452, 464, 52 S.Ct. 420, 76 L.Ed. 877 (1932). In recognition of this preference, courts reviewing warrants "will accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant.'" *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Warrants are not to be subjected to niggling scrutiny, but tested in a common-sense and realistic manner. *Illinois v. Gates,* 462 U.S. 213, 238–239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

A search warrant may issue on a showing of probable cause—something more than suspicion but also something significantly less than evidence necessary to convict. *Henry v. United States,* 361 U.S. 98, 100–102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). "Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible." *Ornelas v. United States,* 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Probable cause is concerned with probabilities, "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). When the constitutional validity of a warrant is challenged, the court must determine whether the facts demonstrated by the officer-ap-

2. The warrant was issued to state officers by a state magistrate acting pursuant to Massachusetts law. Evidence gathered under a state warrant is admissible in federal proceedings if the warrant substantially complies with federal law. *United States v. Soule,* 908 F.2d 1032, 1038–1039 (1st Cir.1990). While Massachusetts law governing searches and seizures differs in some important respects from federal law, in all instances where it does, state law tends to be more protective of privacy rights than its federal homologue. Because the warrant at issue is a state warrant, I will cite state law, where relevant, on the assumption that what is permissible under Massachusetts law is doubly so under federal law.

plicant amounted to a legally sufficient showing of probable cause. *See Beck v. Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (probable cause to arrest).

### Particularity of Description

The Fourth Amendment requires that a warrant "particularly describe" the place to be searched and the persons or things to be seized. *Groh v. Ramirez*, 540 U.S. 551, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004). The description must be sufficiently detailed "that the officer with a search warrant can with reasonable effort ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503, 45 S.Ct. 414, 69 L.Ed. 757 (1925). Minor errors or honest mistakes in describing a location to be searched do not invalidate a warrant. *Maryland v. Garrison*, 480 U.S. 79, 87, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). *Cf. Illinois v. Rodriguez*, 497 U.S. 177, 184, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (reasonableness "does not demand that the government [always] be factually correct."). *See United States v. Burke*, 784 F.2d 1090, 1092 (11th Cir.1986) (although the address was incorrect, the building was described with such specificity that any possibility of a search at the wrong location was eliminated). A facially defective description of the location to be searched may be cured by the independent knowledge of the executing officers or by a more precise description in an attached application or affidavit. W. LaFave, *Search and Seizure*, § 4.5(a) (1996). *See United States v. Bonner*, 808 F.2d 864, 867 (1st Cir.1986) (prior surveillance negated any possibility that police would search an incorrectly identified address); *United*

States v. Curry, 911 F.2d 72, 78 (8th Cir. 1990) (same).

■ The defendants' complaint that the warrant is deficient in its description of the place to be searched is incomprehensible. The warrant authorized officers to search "280 Chestnut Street, second floor apartment, Lynn, MA ... located inside a two and one half story dwelling, having brown wood shingles, yellow trim, and porches on the 1st and 2nd floor in the front, having the number '280' clearly posted on the building's front, between the doors." Short of appended MapQuest directions, it is difficult to imagine how more precisely the apartment's location could have been described.[3] If, on the other hand, defendants mean to suggest (as apparently does Mondello in his Second Supplemental Memorandum) that the warrant was imprecise in failing to specify the precise locations *within* the apartment to be searched (*e.g.*, specific bedrooms), the argument fails as a matter of law. If there is probable cause to believe that criminal activity is afoot in one room of a dwelling, a warrant authorizing the search of the entire premises is not overbroad. W. La-Fave, *Search and Seizure*, § 4.10(a) (1996). *See also Commonwealth v. Waltson*, 555 Pa. 223, 724 A.2d 289, 292–293 (1998) (warrant directed to the basement of a dwelling authorized the search of the entire home for drugs, harmonizing the "greater privacy rights" afforded by the Pennsylvania Constitution with the Fourth Amendment and the uniform law of sister states).[4]

### The Search of the Basement

■ Defendants maintain that in extending the search to the basement of the

---

**3.** A photo of the house was attached to Sgt. Fee's affidavit.

**4.** While Mondello maintains that police lacked probable cause to search the bedroom

of a third tenant of the apartment, Fourth Amendment protections may not be asserted vicariously. *Rakas v. Illinois*, 439 U.S. 128, 138, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

building the officers exceeded the authority granted by the warrant, which according to defendants was (at best) limited to the apartment itself. This argument presents something of a "Catch–22" for defendants. If their position is that the Chestnut Street two-family dwelling should be treated as a unitary premises for purposes of establishing a legitimate expectation of privacy in the basement (a prerequisite for standing to challenge the search), the argument runs afoul of the rule enunciated in *Waltson, supra.* A warrant authorizing the search of a premises permits the search of its appurtenant areas. *See United States v. Ferreras* 192 F.3d 5, 10–11 (1st Cir.1999) (attic); *United States v. Asselin,* 775 F.2d 445, 446–447 (1st Cir. 1985) (birdhouse and parked car); *United States v. Canestri,* 518 F.2d 269, 273–274 (2d Cir.1975) (basement storeroom); *Houser v. Geary,* 465 F.2d 193, 195–196 (9th Cir.1972) (hothouse, shed, and garage adjacent to the dwelling); *Commonwealth v. Signorine,* 404 Mass. 400, 403, 535 N.E.2d 601 (1989) (vehicles parked within the curtilage). If, on the other hand, defendants are arguing that because the building had been subdivided into separate tenancies the search of the basement exceeded the scope of the warrant, they then run afoul of the cases holding that a tenant

cannot claim an expectation of privacy in the common areas of a multi-unit building. *United States v. Hawkins,* 139 F.3d 29, 32–33 (1st Cir.1998) (common areas generally); *United States v. Thornley,* 707 F.2d 622, 624–625 (1st Cir.1983) (basement shared with other tenants); *Commonwealth v. Montanez,* 410 Mass. 290, 301–303, 571 N.E.2d 1372 (1991) (common hallways); *Commonwealth v. Thomas,* 358 Mass. 771, 773–774, 267 N.E.2d 489 (1971) (shared laundry room); *Commonwealth v. Pacheco,* 21 Mass.App.Ct. 565, 567–569, 488 N.E.2d 42 (1986) (shared cellar). Thus, under either analysis, the challenge to the search of the basement fails.[5]

### The "No–Knock" Entry

Under both state and federal law, officers executing a search warrant may make a forcible unannounced entry only on a showing of reasonable cause to believe that a suspect might otherwise escape, destroy evidence, or threaten the safety of the executing officers or the public.[6] *Wilson v. Arkansas,* 514 U.S. 927, 935–937, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995); *Commonwealth v. Scalise,* 387 Mass. 413, 421–422, 439 N.E.2d 818 (1982). *See also United States v. Ramirez,* 523 U.S. 65, 73, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) (the

---

5. This is not to say that a tenant can never establish a reasonable expectation of privacy in a basement shared with other tenants. As the Court remarked in *United States v. Cruz Pagan,* 537 F.2d 554, 558 (1st Cir.1976), the determination turns on the amount of control a tenant retains over personal space within a common area. A locked and secured storage compartment dedicated to the tenant's exclusive use would fall within the protections of the Fourth Amendment. *Montanez,* 410 Mass. at 302, 571 N.E.2d 1372. An open landing in the stairwell of an unlocked basement would not.

6. The Supreme Court does not interpret the Fourth Amendment to require probable cause to believe that evidence might be lost or that

officer safety might be put at risk to justify an unannounced forced entry. *See Richards v. Wisconsin,* 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997) ("[A] reasonable suspicion that knocking and announcing ... would be dangerous or futile, or ... [would allow] the destruction of evidence ... strikes the appropriate [Fourth Amendment] balance between the legitimate law enforcement concerns at issue and the individual privacy interests affected by no-knock entries."). The Massachusetts rule is different. "We see no reason ... to depart from the [probable cause] rule we have previously followed." *Commonwealth v. Macias,* 429 Mass. 698, 701, 711 N.E.2d 130 (1999).

federal "knock-and-announce" statute, 18 U.S.C. § 3109, "codifies the exceptions to the common-law announcement requirement."). Under both state and federal law, if exigent circumstances are not encountered at the scene of the search, officers must knock and identify themselves before forcing an entry. *Scalise*, 387 Mass. at 421, 439 N.E.2d 818; *United States v. Stewart*, 867 F.2d 581, 584–585 (10th Cir.1989). After announcing their presence, officers must give the occupants of a dwelling a reasonable time to respond.[7] What is a "reasonable time" is decided on a case-by-case basis, giving due consideration to the totality of the circumstances confronted by the officers executing the warrant. *United States v. Banks*, 540 U.S. 31, 124 S.Ct. 521, 526–527, 157 L.Ed.2d 343 (2003) (fifteen to twenty seconds delay reasonable where police were seeking a quantity of easily disposable cocaine).

■ Defendants' complaint that the officers erred by initially attempting to gain peaceable entry by misrepresenting their purpose is based on a misunderstanding of the "knock-and-announce" rule. The rule is a prerequisite to *forcible* entry. It does not apply if officers gain entry to a residence without using force, even if a consensual entry is accomplished by a ruse. *Commonwealth v. Sepulveda*, 406 Mass. 180, 182–183, 546 N.E.2d 879 (1989) (undercover officer). *See also United States v. Alejandro*, 368 F.3d 130, 137 (2d Cir. 2004) (officer posed as a gas company employee investigating a leak); *Commonwealth v. Goggin*, 412 Mass. 200, 202, 587 N.E.2d 785 (1992) (police misrepresented their identity to persuade occupants to open the door); *Commonwealth v. Watson*, 36 Mass.App.Ct. 252, 257–258, 629 N.E.2d 1341 (1994) (officer posed as a drug purchaser).

Moreover, the officers here did knock and identify themselves as police, albeit while trumpeting a feigned purpose for their presence. When they received a derisive response, the officers announced their intention to execute a search warrant. The door was taken down only after the officers were definitively (and expletively) refused entry and only after they heard running footsteps from behind the door. While but "a matter of seconds" (Det. Holey's estimate) transpired between the knock and the deployment of the battering ram, the decision to force entry was reasonable, given the object of the search (easily disposed of drugs), the explicit refusal of the defendants to open the door voluntarily, the knowledge of the presence of at least one firearm, and the commotion coming from within the apartment suggesting flight or the destruction of evidence. *See United States v. Sargent*, 319 F.3d 4, 10–12 (1st Cir.2003) (five seconds wait not unreasonable where defendant was heavily armed, in possession of a quantity of easily disposable drugs, and was possibly alerted to the presence of police); *United States v. Bonner*, 874 F.2d 822, 824–826 (D.C.Cir.1989) (twelve seconds wait reasonable when narcotics offi-

---

7. The federal "knock-and-announce" statute, 18 U.S.C. § 3109, unlike Massachusetts law, does not authorize the issuance of an anticipatory "no-knock" warrant. Federal agents are required to announce their authority and purpose (and be refused entry) before using force, unless compliance with the statute "would be dangerous, futile, or destructive to the purposes of the investigation." *Ramirez*, 523 U.S. at 71, 118 S.Ct. 992. The difference is of no moment here as the executing officers did not ask for, and were not granted, "no-knock" authority by the clerk-magistrate. *Cf. Scalise*, 387 Mass. at 421, 439 N.E.2d 818 (a state magistrate may issue an anticipatory "no-knock" warrant on a showing of probable cause that a suspect might otherwise escape, destroy evidence, or pose a threat to the safety of the executing officers).

cers, after identifying themselves, heard footsteps running from the door); *McClure v. United States,* 332 F.2d 19, 21–22 (9th Cir.1964) (same, four to five seconds), *judgment vacated on other grounds,* 59 F.3d 1323 (D.C.Cir.1995); *United States v. Anderson,* 39 F.3d 331, 345–347 (D.C.Cir.1994) (fifteen to twenty seconds, agents heard "shuffling" noises).

*The Existence of Probable Cause*

■ Defendants maintain that Tammy Spillane was an untested informant whose reliability was insufficiently established by Sgt. Fee in his affidavit. The reliability of a "tip" from an informant may be substantiated by a "two-pronged" test, which requires an affiant to make a showing of reasons for believing the informant to be truthful and the basis of her knowledge.[8] *Aguilar,* 378 U.S. at 114, 84 S.Ct. 1509. If the tip fails one or both prongs of the test, probable cause may be nonetheless established by independent corroboration of the tip's details. *Spinelli v. United States,* 393 U.S. 410, 415, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The test is not rigidly applied, rather the "task of the issuing magistrate is simply to make a practical, common-sense decision, whether given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Gates,* 462 U.S. at 238–239, 103 S.Ct. 2317.[9] *Cf. United States v. Czuprynski,* 8 F.3d 1113, 1117 (6th Cir.1993) (under the *Gates* rule, "some independent police investigation to corroborate allegations of criminal activity by an informant [remains] an indispensable element for determining the reliability of the allegations when no other indicia of the informant's credibility or veracity are available.").

Corroboration may be found in the contents of the tip itself when an informant implicates himself in a crime. In *Harris,* 403 U.S. at 574–579, 91 S.Ct. 2075, a plurality of the Court found a "substantial basis" for crediting an informant's information despite the lack of any track record or extrinsic corroboration. Chief Justice Burger, referring to *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), noted that "*Jones* never suggested that an averment of previous

---

**8.** A typical means of demonstrating an informant's veracity is by a showing of prior instances in which her information led to successful arrests, convictions, or the recovery of contraband. *Commonwealth v. Kaufman,* 381 Mass. 301, 302, 408 N.E.2d 871 (1980). There is, however, no rule requiring an informant to have a prior "track record" for her to be found credible. *United States v. Harris,* 403 U.S. 573, 581, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971) (plurality opinion). The second prong of the *Aguilar–Spinelli* test requires a demonstration of the basis of the informant's knowledge. How did she acquire the information that she offers? Most often the informant claims to have seen or overheard what she reports. If so, her observations and opportunity to observe, if sufficiently detailed by the affiant, satisfy the basis of knowledge test. *United States v. Del Toro Soto,* 676 F.2d 13, 19–20 (1st Cir.1982); *Commonwealth v. Pellier,* 362 Mass. 621, 625, 289 N.E.2d 892 (1972). Defendants do not contest Sgt. Fee's demonstration of Spillane's "basis of knowledge."

**9.** Although *Gates* technically overruled *Aguilar* and *Spinelli* by supplanting the "two-pronged" test with a more flexible "totality of the circumstances" test, the Court acknowledged that the *Aguilar–Spinelli* factors nonetheless remain "relevant considerations." *Gates,* 462 U.S. at 233, 103 S.Ct. 2317. Massachusetts has rejected the more open ended *Gates* test, preferring to adhere to the original *Aguilar–Spinelli* test as a matter of state law. *See Commonwealth v. Upton,* 394 Mass. 363, 374, 476 N.E.2d 548 (1985).

reliability was necessary," and concluded that the informant's admissions of his own criminal involvement—his "declarations against penal interest"—carried their own indicia of credibility. *Harris*, 403 U.S. at 581–582, 91 S.Ct. 2075. "People do not lightly admit a crime and place critical evidence in the hands of police in the form of their own admissions." *Id.* at 583, 91 S.Ct. 2075. *See also United States v. Schaefer*, 87 F.3d 562, 566 (1st Cir.1996) (same). The fact that an informant is willing to have her identity revealed also vouches for her credibility. *United States v. Campbell*, 732 F.2d 1017, 1019 (1st Cir. 1984); *Commonwealth v. Freiberg*, 405 Mass. 282, 297–298, 540 N.E.2d 1289 (1989); *Commonwealth v. Burt*, 393 Mass. 703, 710, 473 N.E.2d 683 (1985). Spillane's admissions of illegal drug use, buttressed by her willingness to have her name and address appear in the affidavit, were sufficient guarantees of her veracity even putting aside any independent police corroboration of her tip.[10]

*The Franks Issue*

■ While a judicial ruling on a motion to suppress is ordinarily confined to the "four corners" of the affidavit, there are circumstances in which a defendant may be entitled to challenge in an evidentiary hearing the truthfulness of statements made by the affiant. *See Franks v. Dela-ware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *Commonwealth v. Reynolds*, 374 Mass. 142, 370 N.E.2d 1375 (1977). *Cf. United States v. Southard*, 700 F.2d 1, 7 (1st Cir.1983) (a facially sufficient affidavit is entitled to a presumption of validity). To be entitled to a *Franks* hearing, a defendant must make a "substantial preliminary showing" that an affidavit contains intentionally false or recklessly untrue statements that are material to the finding of probable cause.[11] *Franks*, 438 U.S. at 155–156, 170, 98 S.Ct. 2674. A substantial showing " 'lies somewhere between mere denials on the one hand and proof by a preponderance [of the evidence] on the other.' " *Commonwealth v. Ramirez*, 416 Mass. 41, 49–50, 617 N.E.2d 983 (1993), quoting *People v. Lucente*, 116 Ill.2d 133, 107 Ill.Dec. 214, 506 N.E.2d 1269, 1277 (1987). "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable

---

**10.** This consisted of the confirmation of Legault's record of drug and firearm offenses and the observation of the cookware box in Legault's trash. While not overwhelming, each item deserves at least some credit. *See Harris*, 403 U.S. at 579–580, 91 S.Ct. 2075 (a suspect's reputation or criminal record, if known to the affiant, may be considered by the magistrate as evidence of a criminal disposition). Corroboration of arguably innocent facts may also be considered in the analysis of an informant's tip, although innocent facts carry less weight than the corroboration of facts suggestive of criminal conduct. *Commonwealth v. Upton (I)*, 390 Mass. 562, 571, 458 N.E.2d 717 (1983). *Cf. United States v. Arvizu*, 534 U.S. 266, 273–274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (seemingly innocent facts when "taken together" by an experienced officer may provide the articulable suspicion necessary to justify a *Terry* stop).

**11.** Defendants have received most of the benefits of a *Franks* hearing, as Sgt. Fee testified at the evidentiary hearing on the motion to suppress and was cross-examined on the circumstances underlying his affidavit. I recite the foundational law authorizing the convening of a *Franks* hearing only to illustrate the reasons why no further *Franks* inquiry is necessary.

statements of witnesses should be furnished, or their absence satisfactorily explained." *Franks,* 438 U.S. at 171, 98 S.Ct. 2674.

If a hearing is warranted, the defendant must prove the knowing falsity or recklessness of the affiant's statements by a preponderance of the evidence. *Franks,* 438 U.S. at 156, 98 S.Ct. 2674. The defendant must also show that any deliberately false or reckless statement was material to the determination of probable cause. If such a showing is made the offending statement is excised from the affidavit, which is then reexamined for probable cause. *Id.* at 171–172, 98 S.Ct. 2674; *United States v. Veillette,* 778 F.2d 899, 904 (1st Cir.1985).

A *Franks* issue is also raised by the intentionally misleading or reckless omission of material information from the affidavit. *United States v. Rumney,* 867 F.2d 714, 720 (1st Cir.1989). *Cf. United States v. Atkin,* 107 F.3d 1213, 1217 (6th Cir. 1997) ("[A]n affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information."). The omission of a fact that does not cast doubt on the existence of probable cause is not a material misrepresentation. *United States v. Moscatiello,* 771 F.2d 589, 603 (1st Cir. 1985) *judgment vacated on other grounds,* 476 U.S. 1138, 106 S.Ct. 2241, 90 L.Ed.2d 688 (1986); *United States v. Dennis,* 625 F.2d 782, 791 (8th Cir.1980). A reviewing court should add any facts intentionally or recklessly omitted from the affidavit and determine whether the new information, if included, would have defeated the finding of probable cause. *United States v. Cole,* 807 F.2d 262, 267–268 (1st Cir.1986).

Defendants have not pointed to any information in the affidavit that could possibly be labeled false or inaccurate other than Spillane's arguably inaccurate physical description of "Billy" (Mondello).[12] The quibble is irrelevant. A *Franks* hearing is limited to the issue of the affiant's veracity and care. *Franks,* 438 U.S. at 171, 98 S.Ct. 2674. The credibility of an informant is tested by the rules of *Aguilar* and *Spinelli* (as modified by *Gates* ). *See United States v. Carmichael,* 489 F.2d 983, 989 (7th Cir.1973). Defendants point rather to what they consider critical omissions in the affidavit regarding Spillane's criminal background and her request for leniency in exchange for information. Spillane has a lengthy criminal record stemming from her involvement with drugs. Although most of her offenses are relatively minor (she appears, for example, to be a serial shoplifter), her record is replete with defaults on court appearances (eighty-six by defendants' count). This record (and the fact that Spillane was under arrest as the affidavit was being composed) was not disclosed by Sgt. Fee, who characterized Spillane benignly as someone who for unstated reasons "wished to cooperate with [l]aw [e]nforcement in catching her cocaine supplier." *Cf. United States v. Nelson–Rodriguez,* 319 F.3d 12, 33–34 (1st Cir. 2003) (despite the fact that a prior conviction bearing on the informant's credibility should have been disclosed in the affidavit, ample probable cause was nonetheless demonstrated). While Sgt. Fee would have been well-advised to reference Spillane's record, he made no secret of the fact that Spillane was a drug addict who admitted to having purchased cocaine on dozens of occasions from the defendants. That Spillane had been promised a favorable bail determination in exchange for her truthful cooperation should also have been included, not because, as defendants argue,

---

**12.** I say "arguably" because defendants seem to have confused the description Spillane gave of "John" with the one that she gave for "Billy."

it would have weakened the showing of her credibility, but because it would have enhanced it. *See Commonwealth v. Melendez*, 407 Mass. 53, 57, 551 N.E.2d 514 (1990) ("Statements may be more credible if there is a threat of police retaliation for giving false information."); *Commonwealth v. Love*, 56 Mass.App.Ct. 229, 234 n. 6, 775 N.E.2d 1264 (2002) (same, noting that an identified informant exposes herself to a charge of filing a false report with police under G.L. c. 269, § 13A). *See also United States v. Miller*, 925 F.2d 695, 699 (4th Cir.1991) (an informant's interest in obtaining leniency creates a strong incentive to supply accurate information); *United States v. Reivich*, 793 F.2d 957, 962–963 (8th Cir.1986) (offers of leniency are not inconsistent with inferences of reliability that attach to statements against penal interest). *Cf. Florida v. J.L.*, 529 U.S. 266, 276, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (Kennedy, J., concurring) (a tip is to be accorded greater credibility where the informant "places his anonymity at risk," thereby exposing himself to official sanction). In sum, the omissions do not fatally undermine the affidavit's showing of probable cause.[13]

### ORDER

For the foregoing reasons, defendants' motion to suppress is *DENIED.*

SO ORDERED.

---

**13.** Defendants' final point, that they were deprived of a determination of probable cause by a neutral magistrate, is based on the assurances that Judge Dever gave to Sgt. Fee regarding Spillane's bail status, and the mistaken assertion that he thereafter issued the warrant. While the point is pressed at some length in the defendants' briefs, it is based on a procedural misunderstanding. The warrant was not issued by Judge Dever, but by Lynn Clerk–Magistrate Sharleen Cole. After signing the warrant, Cole inserted Judge Dever's name on the warrant form as the "witnessing" First Justice, a procedural formality akin to the listing of the United States Attorney's name in the block signature that appears above the written signature of the Assistant United States Attorney who is in fact responsible for the pleading.