COMMONWEALTH vs. RICHARD S. FREIBERG.

Suffolk.    January 3, 1989. — July 6, 1989.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Mental Impairment. Intent. Malice. Intoxication. Practice, Criminal,* New trial, Challenge to jurors, Grand jury proceedings, Instructions to jury. *Due Process of Law,* Vagueness of statute, Fair trial, Identification. *Constitutional Law,* Equal protection of laws, Jury, Search and seizure. *Identification. Search and Seizure,* Exigent circumstances, Probable cause, Affidavit, Warrant, Return, Arrest. *Evidence,* Scientific test, Expert opinion, State of mind, Sound recording, Photograph. *Words,* "Extreme atrocity or cruelty."

A defendant convicted of first degree murder on the theory of extreme atrocity or cruelty was not entitled to a new trial in order to present certain evidence of mental impairment, where the evidence in question had been available to him at the time of his trial and he had decided, as matter of trial strategy, not to introduce it. [287-288]

This court declined to impose a requirement that, to convict a defendant of first degree murder on the theory of extreme atrocity or cruelty, a jury must find that he intended to inflict extraordinary pain or suffering on the victim. [288]

The phrase "extreme atrocity or cruelty" in G.L. c. 265, § 1, defining first degree murder, is not unconstitutionally vague. [288-290]

Evidence at a murder trial was sufficient to support a verdict of guilty of murder in the first degree on the theory of extreme atrocity or cruelty. [290-291]

At a first degree murder trial, the judge's procedure (permitted by rule 6 of the Superior Court [1974]) requiring the defendant to exercise his peremptory challenges as to each juror individually, after the juror was found indifferent, instead of allowing the exercise of peremptory challenges after a full jury had been selected, infringed no Federal or State constitutional guaranty of equal protection of the laws, due process of law, or a trial by an impartial jury. [291-293]

At a murder trial the judge properly denied the defendant's motion to suppress evidence of one-on-one pretrial and in-court identifications by a witness who had observed the defendant burying the victim in the backyard of his house. [293-295]

No substantial issue was presented by a criminal defendant's claim that a warrantless police entry of his home was not justified by exigent circumstances. [297]

Probable cause for issuance of a warrant to search a house was established by a police officer's affidavit detailing an identified person's observations of the burial of a body in the rear yard of the house and reciting facts that corroborated those observations. [297-298]

A seach warrant, which was issued pursuant to an application made immediately after the police discovered a young woman suffering mortal head wounds buried in the rear yard of the house to be searched, and which identified "blood — clothing — or any other instrument used in crime" as the items to be seized, described with sufficient particularity the items to be seized from the house. [298-299]

It was permissible for police officers to photograph the interior of a house while they were on the premises to execute a search warrant. [299]

A bloodstained article of clothing, which constituted evidence of the crime with which a defendant was later charged, was properly taken from him by police after his arrest. [299]

Misplacement of certain information inserted in a printed form of search warrant did not invalidate the warrant where a reader could determine, without great difficulty, what premises were to be searched and what items were sought. [299-300]

A misstatement of the time a search was conducted in the return of a valid search warrant, found by a judge to be a "mistake made in haste," did not render unlawful the search conducted pursuant to the warrant. [300]

Certain grand jury testimony of a police witness, even if it vaguely suggested that a defendant made inculpatory statements after being informed of his Miranda rights, provided no ground for challenging the defendant's indictment for murder. [300-301]

A judge properly denied a defendant's motion to suppress evidence of a police laboratory's destructive testing of part of a blood stain on an article of clothing taken from the defendant after his arrest where the defendant did not avail himself of the opportunity afforded him to perform testing of his own on the remaining stains. [301-302]

At a murder trial no evidence was presented that would have warranted a jury instruction on voluntary manslaughter. [302-303]

A defendant convicted of first degree murder on the theory of extreme atrocity or cruelty could not have been prejudiced by the judge's jury instructions, which were correct, on the alternative theory of deliberate premeditation. [303]

At a criminal trial the judge's instructions adequately apprised the jury of their duty in evaluating the credibility of witnesses. [303-304]

At a murder trial the medical examiner who had performed an autopsy on the victim's body and who had examined photographs of a kitchen stove in the defendant's house could properly testify to his opinion that the victim's injuries were caused by her head being struck against the stove. [304]

At a murder trial the judge properly admitted evidence tending to establish
the defendant's motive for committing the crime. [304-305]

At a criminal trial the judge did not abuse his discretion by allowing a tape
recording of a telephone conversation, which had been admitted in evi-
dence, to be played in court a second time. [305]

At a first degree murder trial that proceeded, in part, on the theory that the
crime was committed with extreme atrocity or cruelty, photographs
showing the victim's head injuries were properly admitted in evidence.
[305]

INDICTMENT found and returned in the Superior Court De-
partment on July 18, 1986.

The case was tried before *Robert A. Mulligan,* J., and a
motion for a new trial was heard by him.

*A. Hugh Scott (Edward H. Seksay* with him) for the defend-
ant.

*Sharon B. Soffer,* Assistant District Attorney, for the Com-
monwealth.

LIACOS, C.J.  The defendant, Richard S. Freiberg, appeals
from his conviction of murder in the first degree on the basis
of extreme atrocity or cruelty. He also appeals from the denial
of his motion for a new trial.[1] He asserts numerous claims of
error, each of which we address below. We affirm the convic-
tion. Also, we affirm the denial of his motion for a new trial.

We recite in summary form the evidence put before the jury.

On the morning of May 14, 1986, the victim, Lisa Margil,
a student at Boston University, arrived at the defendant's home
at 461 LaGrange Street in the West Roxbury section of Boston.
The victim and the defendant walked with Brian B. Lincoln,
a mutual friend, to a nearby liquor store where they purchased
some beer and vodka. During the course of the morning, the
defendant had at least one beer and shared two pipe bowls full
of marihuana with the victim and Lincoln. The three were
joined at approximately 12:30 P.M. by Christopher Hurley, a
friend of the defendant's younger brother.

---

[1] We treat the arguments arising from this motion in combination with
our discussion of the defendant's claims of error in his direct appeal.

Hurley watched the defendant and the victim playing a drinking game while they sat at the kitchen table. The victim consumed at least three shot glasses full of vodka during this game. The defendant, in addition to having some vodka during the game, was drinking vodka out of a mug. When the victim refused to continue drinking, the defendant became angry and pressed her to drink more.

The defendant and the victim remained in the kitchen; Hurley and Lincoln repaired to the adjoining living room. After about fifteen minutes, the defendant came into the living room with a worried look on his face. He asked Lincoln and Hurley to go upstairs. They had not heard any untoward noises, but, as they were leaving the living room, Lincoln heard, coming from the kitchen, a series of short, sharp breaths, as if someone were about to vomit. Lincoln asked the defendant if anything was wrong, to which the defendant responded, "No, no, no, no, just go upstairs." Hurley and Lincoln went upstairs to the bedroom of the defendant's brother.

About fifteen minutes later, the defendant came upstairs and slowly pushed the bedroom door open. He asked Lincoln to follow him. The defendant said that Lisa Margil was dead. He explained, "I went over to the table, I picked up my bag and turned around and she spun around and fell down and hit her head next to the stove and split her head open and her brains are all over the floor."

The defendant and Lincoln went to the kitchen where the victim was on her knees next to the stove, breathing quickly. Blood was splattered in front of her and was flowing out from between her legs. White brain matter was oozing from the back of her head. Lincoln urged the defendant to call an ambulance. The defendant refused, saying that he had three warrants out for his arrest. The defendant persuaded Lincoln to go upstairs again. The defendant asked Lincoln to put the victim's body in his automobile and to leave it on some nearby abandoned railroad tracks. Lincoln refused, and again urged the defendant to call an ambulance.

When the defendant was about to tell Hurley what had happened in the kitchen, Lincoln ran downstairs and out to his auto-

mobile. The defendant pursued Lincoln, got in the passenger's seat, and turned off the ignition. Lincoln again told the defendant to call an ambulance. The defendant refused and got out of Lincoln's automobile. Lincoln drove away. Hurley left the defendant's home shortly thereafter.

Lincoln proceeded to a nearby gasoline station where he telephoned the emergency 911 number, told the operator to send an ambulance to the defendant's house immediately, and described the nature of the victim's injuries. The 911 operator called the defendant's telephone number in order to help him administer assistance to the injured person. The defendant answered the phone and cancelled the ambulance, falsely stating that "[s]he just walked up and left. . . . I tried to stop her and she just ran away."

The defendant placed a large green garbage bag over the head and torso of the victim, carried her out to his backyard, and dropped her in a large hole. The defendant dropped a large rock in the hole and shovelled dirt into it, completely covering the body. The defendant then returned to the house. The burial was observed by Mac Brodie, an employee of the Boston Edison Company, from the vantage point of an aerial lift bucket truck where he was transferring wires to a new utility pole. Brodie sent a fellow worker to get a police officer. The officer arrived and began to dig away the dirt from the burial area. He saw the victim's legs. The victim started to move; it was clear that she was still alive. The police officer, Brodie, and his fellow worker dug furiously until they got the victim out. They observed that the victim's head had been split open and that portions of her brain were spilling out. She was breathing hard, gasping for air, but appeared to be unconscious. When an emergency medical technician, who arrived soon thereafter, pinched the victim to determine whether she could feel pain, the victim responded by moaning. The victim was taken to the Faulkner Hospital, where she died within a few hours.

Several police officers arrived at the scene. The defendant was found in the basement of his home and was taken to the back porch, where Brodie positively identified him as the man whom he had seen burying the victim.

Dr. Leonard Atkins conducted an autopsy. He testified at trial that the victim's injuries were consistent with her head being banged against the kitchen stove with a "very severe degree of force." Dr. Atkins also testified that the injuries were caused by more than one blow to the head, assuming that they were not caused by a "pattern-type instrument." He testified that the injuries could not have been caused by someone falling against a metal stove or against a floor. The blows to the head, which probably rendered the victim unconscious, were the cause of the victim's death.

1. *Mental impairment.* The defendant contends that *Commonwealth* v. *Grey*, 399 Mass. 469 (1987), which was decided two weeks after the jury reached their verdict in this case, entitles the defendant to a new trial. In *Grey*, we concluded that "we should permit the jury to consider evidence of mental impairment at the time of the crime" in determining whether the defendant had malice aforethought, in that he specifically intended to kill or to cause grievous bodily harm to the victim. *Id.* at 470-471. Even assuming, without deciding, that *Grey* applies retroactively to this case, we hold that the lack of a *Grey* charge did not create a substantial likelihood of a miscarriage of justice under G.L. c. 278, § 33E (1986 ed.).[2]

The defendant's behavior did not manifest signs of intoxication or mental impairment triggered by intoxication. See *Commonwealth* v. *Griffith*, 404 Mass. 256, 260 (1989). Just before the killing, the defendant's speech was not slurred, and he did not stumble. Shortly after the attack, the defendant had the presence of mind to cancel the ambulance, falsely stating to the 911 operator that the victim was not seriously injured and that she had gone home. The defendant then carried the still-living victim's body to a hole in his backyard and buried her there. The defendant then hid in his basement and, after being found by the police, did not have trouble walking up the narrow basement staircase.

---

[2] The defendant did not object to the lack of a *Grey* charge. See *Commonwealth* v. *Fano*, 400 Mass. 296, 306-307 (1987).

In addition, the judge did not foreclose the jury from considering the effect of alcohol or drugs on the malice element. Cf. *Commonwealth* v. *Glass*, 401 Mass. 799, 810 (1988).

We reject the defendant's argument that he is entitled to present, at a new trial, evidence from two psychiatrists that the defendant allegedly was suffering from an "impulse control disorder" at the time of the killing. The defendant concedes that this evidence was not newly discovered and admits that he made a conscious strategic decision not to introduce it at the trial. The defendant may not, after losing on one theory, retry his case on an alternate theory on which admissible, highly relevant evidence was available to him at the time of the trial. See *Commonwealth* v. *Brown*, 378 Mass. 165, 170 (1979).

2. *Extreme atrocity or cruelty.* The defendant urges us to add a new intent element to the crime of murder by extreme atrocity or cruelty.

We have recently considered, and rejected, the suggestion that we transform the legal standard for that crime to include an element of intent to inflict extraordinary pain or suffering. *Commonwealth* v. *Sinnott*, 399 Mass. 863, 879 (1987). *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227-229 (1983). In *Cunneen, supra* at 227, we stated that "[w]e adhere to our view that proof of malice aforethought is the only requisite mental intent for a conviction of murder in the first degree based on murder committed with extreme atrocity or cruelty." We decline the invitation to reconsider our recent decisions on this point.

3. *Vagueness.* The defendant challenges the constitutionality of G.L. c. 265, § 1, claiming that the phrase "extreme atrocity or cruelty" is vague and thus violates due process as guaranteed by the Fourteenth Amendment to the United States Constitution and art. 10 of the Massachusetts Declaration of Rights.

"A law is void for vagueness if persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.' *Smith* v. *Goguen*, 415 U.S. 566, 572 n.8 (1974), quoting *Connally* v. *General Constr. Co.*, 269 U.S.

385, 391 (1926). Vague laws violate due process because individuals do not receive fair notice of the conduct proscribed by a statute, *Papachristou* v. *Jacksonville*, 405 U.S. 156, 162 (1972), and because vague laws that do not limit the exercise of discretion by officials engender the possibility of arbitrary and discriminatory enforcement, *Grayned* v. *Rockford*, 408 U.S. 104, 108-109 & n.4 (1972)." *Caswell* v. *Licensing Comm'n for Brockton*, 387 Mass. 864, 873 (1983).

We already have held that "our definition of extreme atrocity or cruelty provides satisfactory warning to potential defendants." *Commonwealth* v. *Glass, supra* at 805. See *Commonwealth* v. *Eisen*, 358 Mass. 740, 747 (1971); *Commonwealth* v. *Satterfield*, 362 Mass. 78, 82-83 (1972). The defendant rightly concedes that, in determining whether a statute is unconstitutionally vague, we may consider limiting judicial constructions which have been employed in its interpretation. See *Kolender* v. *Lawson*, 461 U.S. 352, 355 (1983); *Caswell, supra* at 873 n.6.

The phrase "extreme atrocity or cruelty," when considered in light of over a century of judicial interpretation, provides meaningful guidance to juries in their consideration whether to find a defendant guilty of first degree murder on that ground. Juries take into account a number of factors in deciding whether a murder was committed with "extreme atrocity or cruelty," namely, "indifference to or taking pleasure in the victim's suffering, consciousness and degree of suffering of the victim, extent of physical injuries, number of blows, manner and force with which delivered, instrument employed, and disproportion between the means needed to cause death and those employed." *Commonwealth* v. *Cunneen, supra* at 227.

We have stated that "[t]he final determination of whether extreme atrocity or cruelty exists . . . must be decided by the jury, who, as the repository of the community's conscience, can best determine when the mode of inflicting death is so shocking as to amount to extreme atrocity or cruelty." *Commonwealth* v. *Connolly*, 356 Mass. 617, 628, cert. denied, 400 U.S. 843 (1970). *Commonwealth* v. *Lacy*, 371 Mass. 363, 367-368 (1976). While the jury serve as the "community's

conscience," they nonetheless consider the aforementioned factors in determining whether a murder was committed with extreme atrocity or cruelty. Additionally, the standard has been further limited by our permitting the jury to consider the effect of mental impairment or intoxication on the defendant's ability to commit the murder with extreme atrocity or cruelty. *Commonwealth* v. *Perry*, 385 Mass. 639 (1982). *Commonwealth* v. *Gould*, 380 Mass. 672 (1980). We have stated recently that "it is [not] constitutionally improper to permit a jury, in effect, to decide an aspect of a murderer's sentence by determining the degree of atrocity or cruelty in the murderer's conduct, at least where the possibility of a sentence of death is not at issue." *Commonwealth* v. *Glass, supra*. General Laws c. 265, § 1, as construed, is not vague.

4. *Sufficiency of the evidence*. The defendant argues that the evidence does not support a finding of extreme atrocity or cruelty, and that his motions for a required finding of not guilty should have been granted. We disagree.

In the previous section, we listed the factors which a jury may consider in deciding whether a murder was committed with extreme atrocity or cruelty. Viewing the evidence in a light most favorable to the Commonwealth, we conclude that sufficient evidence existed for the jury to find extreme atrocity or cruelty. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979).

The defendant used a "very severe" degree of force in inflicting the wounds upon the victim. There was evidence which supported a finding that the defendant had smashed the victim's head against the kitchen stove three separate times.[3] There was evidence that the victim was unconscious after the first blows, there was also evidence that she was gasping for air after receiving the blows and could feel pain after she had been rescued from the backyard grave.[4] The extent of the victim's

---

[3] We have held that murder by extreme atrocity or cruelty can occur even if the death results from a single blow. *Commonwealth* v. *Glass, supra* at 803. *Commonwealth* v. *Golston*, 373 Mass. 249, 260 (1977), cert. denied, 434 U.S. 1039 (1978).

[4] We note also that "[t]his court has not required suffering by the victim

injuries were such that her skull was cracked open, she bled profusely, and portions of her brain oozed out of her head. The defendant displayed indifference to the victim's suffering by refusing to call an ambulance, asking his friend to dump her body on the abandoned railroad tracks, cancelling the ambulance which his friend had called, placing a garbage bag over the victim's head, and then burying her while she was still alive. In sum, there was ample evidence for the jury to find that the defendant committed the murder with extreme atrocity or cruelty. There was no error.

5. *Peremptory challenges.* The defendant argues that the judge's use of rule 6 of the Rules of the Superior Court (1974) to limit the time of his use of peremptory challenges deprived him of equal protection of the laws, due process of law, and his right to trial by an impartial jury under both State and Federal Constitutions. We disagree.

The trial judge required the defendant to exercise his peremptory challenges individually as to each juror, after he or she was found indifferent, instead of allowing him to exercise his peremptory challenges after a full jury had been selected. Under rule 6 of the Superior Court (1974), this procedure was permissible. See *Commonwealth* v. *Barry*, 397 Mass. 718, 726 (1986). Rule 6's requirement that peremptory challenges shall be made only after a full jury has been found to stand indifferent does not apply to indictments for crimes punishable by death. We have held that "the exception in rule 6 for trials on indictments for crimes punishable by death applies to trials for murder in the first degree." *Id.*

The defendant claims that the disparate treatment between capital defendants and other defendants deprives him of the equal protection of the laws. "[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class" (footnote omitted). *Massachusetts Bd. of*

---

as an 'indispensable element of the crime of murder with extreme atrocity or cruelty.'" *Commonwealth* v. *Garabedian*, 399 Mass. 304, 311 (1987), quoting *Commonwealth* v. *Podlaski*, 377 Mass. 339, 348 (1979).

*Retirement* v. *Murgia*, 427 U.S. 307, 312 (1976). *Fine* v. *Contributory Retirement Appeal Bd.*, 401 Mass. 639, 641 (1988). The exception in rule 6 does not interfere with the exercise of a fundamental right.[5] There is no fundamental right to peremptory challenges under either Federal or Massachusetts constitutional law. *Commonwealth* v. *Wood*, 389 Mass. 552, 559 (1983) (Federal law). *Commonwealth* v. *Reid*, 384 Mass. 247, 253-254 (1981) (State law). See *Ross* v. *Oklahoma*, 487 U.S. 81, 89 (1988).

Nothing in *Commonwealth* v. *Brown*, 395 Mass. 604 (1985), or *Commonwealth* v. *Ptomey*, 26 Mass. App. Ct. 491 (1988), indicates that there is a fundamental right to peremptory challenges. The decisions to reverse the convictions in those cases were based on the failure of the trial judges to follow the mandates of rule 6, and on the general principle that rules should be applied consistently. See *Brown, supra* at 606; *Ptomey, supra* at 495-496. The fact that this court and the Appeals Court will ensure the effective implementation of a procedural rule does not elevate the content of that rule to the level of a fundamental right.

We thus review rule 6 to determine whether it is "rationally related to furthering a legitimate state interest." *Murgia, supra* at 312. See *Marshfield Family Skateland, Inc.* v. *Marshfield*, 389 Mass. 436, 446, appeal dismissed, 464 U.S. 987 (1983). Under the "rational basis" test, the rule must be "accorded a presumption of constitutionality." *Pinnick* v. *Cleary*, 360 Mass. 1, 14 (1971). The challenger bears "an onerous burden of proof in establishing the invalidity of the [rule]." *Marshfield, supra* at 446, quoting *Commonwealth* v. *Henry's Drywall Co.*, 366 Mass. 539, 541 (1974). We shall not invalidate the rule "if any state of facts reasonably may be conceived to justify it." *Id*. The defendant has failed to meet his burden of proving that no rational basis for rule 6 exists.

We already have explained the basis for rule 6's exception. "Because of the many more peremptory challenges in a capital

---

[5] The defendant does not argue that capital defendants comprise a "suspect class."

case, seating the jury will be a lengthier process. To help streamline the process, the juror-by-juror method of challenge may be adopted." *Barry, supra* at 725-726. See Superior Court Rules, 1954, Annotated 191 (E. Dangel ed. 1954).[6] This justification satisfies the rational basis test under equal protection analysis.

The defendant has not been deprived of due process of law or of an impartial jury as guaranteed by the Sixth Amendment to the United States Constitution. The procedure utilized by the judge assured the defendant of a fair and impartial trial. The judge interrogated each juror individually, pursuant to Mass. R. Crim. P. 20(b)(1)-(2), 378 Mass. 889 (1979). The defendant was entitled to an unlimited number of challenges for cause. Pursuant to Mass. R. Crim. P. 20 (c)-(d), the defendant was granted sixteen peremptory challenges, each of which he could use after a prospective juror was found by the judge to stand indifferent. The procedure granted to the defendant satisfied due process principles. See *Ross* v. *Oklahoma, supra.* Additionally, the exception in rule 6 did not deprive the defendant of an impartial jury under the Sixth Amendment. The Supreme Court recently has stated: "[W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension . . . . They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." (Citations omitted.) *Id.* at 88. Because there has been no showing that the jury was not impartial, the defendant was not deprived of his right to an impartial jury. There was no error.

6. *Identification.* The defendant claims that the judge erroneously denied his motion to suppress Brodie's pretrial and trial identification of the defendant. We disagree.

---

[6] Rule 48 of the Rules of the Superior Court (1954) is the predecessor of rule 6 of the Rules of the Superior Court (1974).

The judge made the following findings of fact. Brodie, an employee of the Boston Edison Company, was working on an overhead utility pole near 461 LaGrange Street on a bright sunny day. Brodie observed a man carrying a body from the house to a hole in the backyard, dropping the body into the hole and walking back to the house. Two to three minutes later, the man reappeared from the house with a shovel, walked to the hole, and stood facing Brodie. He dropped a rock into the hole and shoveled dirt into it. When finished, he returned to the house.

Brodie, who uses no visual aids and has 20/15 vision, and who was approximately 120 to 125 feet from the burial site, had an unobstructed view of the man's face for four to five seconds before the defendant first went into the house, then for three to four minutes while he shovelled dirt into the hole.

After the victim was extracted from the hole, Brodie described the man he had seen as a white male with red hair, approximately twenty years of age, five feet ten inches tall, with a husky build, shirtless, wearing white sneakers and jeans. Brodie could not describe the man's face but said that he would know him if he saw him. Brodie was asked by the police to remain at the scene to help identify any suspect discovered. Brodie believed that the man was still in the house. He overheard a radio report that a suspect was found in the basement of the house. About an hour after observing the man burying the victim, Brodie positively identified the defendant as the man he had seen. At the time of the identification, the defendant was on the back porch, handcuffed, with several police officers standing near him.

Later, at a probable cause hearing, Brodie also positively identified the defendant as the man he had seen burying the victim. At the time, the defendant was in a prisoner's dock, handcuffed and manacled.

In the absence of clear error, we are bound by the judge's findings of fact. *Commonwealth* v. *Correia*, 381 Mass. 65, 76 (1980). While we must undertake an independent examination of the ultimate conclusions of law reached by the judge, we view these conclusions "with particular respect." *Id.* The

judge concluded that the defendant failed to meet his burden of showing that the identifications were unnecessarily suggestive. See *Commonwealth* v. *Toney*, 385 Mass. 575, 586 (1982). We agree.

While one-on-one confrontations are not encouraged, they are also not subject to a rule of per se exclusion. "We have repeatedly held that due process rights are not violated when police arrange a one-on-one confrontation between the victim and a suspect promptly after a criminal event occurs." *Commonwealth* v. *Williams*, 399 Mass. 60, 67 (1987), quoting *Commonwealth* v. *Harris*, 395 Mass. 296, 299 (1985). It is immaterial that the identifying witness is not also a victim. *Id.* We find no error in the judge's findings that the showup was not unnecessarily suggestive.

We also reject the defendant's challenge of the judge's denial of his motion to suppress the identification at the probable cause hearing. While "a degree of suggestiveness inheres in any identification of a suspect who is isolated in a court room . . . such isolation does not, in itself, render the identification impermissibly suggestive." *Commonwealth* v. *Napolitano*, 378 Mass. 599, 604 (1979). See *Commonwealth* v. *Dickerson*, 372 Mass. 783, 791 (1977).

In addition, even if the identification at the probable cause hearing can be considered suggestive, the Commonwealth met its burden of proving that Brodie's "identification ha[d] a source independent of the suggestive confrontation." *Commonwealth* v. *Correia, supra* at 78, quoting *Commonwealth* v. *Botelho,* 369 Mass. 860, 868 (1976). Brodie, who has excellent vision, observed the defendant for more than three minutes on a clear, sunny day, with an unobstructed view. He provided an accurate, detailed description of the defendant before identifying him, within approximately one hour of his observations. See *Commonwealth* v. *Bodden*, 391 Mass. 356, 361 (1984). "It follows that the in-court identification was not tainted and that its admission in evidence was not error." *Commonwealth* v. *Williams, supra* at 68.

7. *Search and Seizure.* The defendant asserts that the judge erred in denying the defendant's motion to suppress evidence

obtained during a search of the defendant's home. We hold that there was no error.

Detective William J. Cannon submitted an affidavit to a magistrate at the West Roxbury District Court in support of his application for a search warrant at 3 to 3:15 P.M. on May 14, 1986.[7] The magistrate issued a search warrant based on this affidavit at approximately 3:15 P.M. The warrant listed "blood — clothing — or any other instrument used in crime" in the space immediately preceding that which called for the items to be sought.

Prior to the search pursuant to this warrant, police officers had entered the house at approximately 2:30 P.M. The judge found that exigent circumstances existed which justified the police officers' warrantless entry.[8] The judge found that no property was seized during the first entry and that no observations made in the first entry were used in Cannon's affidavit in support of his application for a warrant. The exigent entry was terminated "sometime before 3:00 P.M."

Pursuant to the warrant, the police entered the house at approximately 3:15 P.M. and discovered the defendant lying

---

[7] The affidavit provided: "On this date 5-14-86 about 2:40 P.M. Detectives George Bishop and William Cannon responded to a radio call to 461 La-Grange St. W[est] Rox[bury]. There officers met Mac Brodie . . . an Edison worker. Mac Brodie stated while up the pole he observed a white man 23 yrs, 5-10, 175 lb, blue jeans, white sneaker shirtless drag a body from the house and bury it in the back yard. A freshly dug grave was found and the still living body of an unknown white female was removed from grave with a severe head wound unknown what type of weapon was used. A search warrant for the premises of 461 LaGrange St. W[est] Rox[bury] a 2½ story wooden white dwelling with black shutters is requested for search of dwelling for evidence of blood, weapons [or] fruits of the crime. Home listed to D.R. Freiberg, 461 LaGrange St. W[est] Rox[bury]. Area includes all pertinents [sic] attic, cellar and rooms thereof."

[8] The judge stated that "the police, having just found a still living woman buried in the backyard of the house, could have reasonably harbored a genuine concern that additional victims and/or a dangerous felon might be in the house. It was reasonable to believe that any delay, resulting from seeking a warrant prior to entry, would substantially increase the risk of loss or destruction of evidence. Mr. Brodie's reliable information provided ample support for a strong belief by the police that the perpetrator of this particularly brutal crime was still on the premises, certainly dangerous and quite possibly armed."

under the cellar stairs. The police searched all of the rooms, the cellar, attic, hallways, closets, and other storage areas in the house. Property seized during the search included samples of reddish brown stains from the kitchen floor in front of the stove, from a bag in the kitchen closet, and from the kitchen sink disposal inlet; a mop with reddish brown stains; a flower pot with reddish brown stains; a hair from the top of the kitchen stove; and a pair of eyeglasses found in the kitchen closet. The police took photographs of bloodstained areas in the kitchen.

The police retained a green trash bag which was removed from the body of the victim after she was retrieved from the hole. A pair of blue jeans with reddish brown stains was taken from the defendant after he was charged and booked at the Area B police station.

a. *Exigent circumstances.* The defendant claims that the initial warrantless search of the house was not justified by any exigent circumstances. Since the judge found that no evidence was seized during this entry and that the affidavit was not based on it, there is no merit to this claim.[9]

b. *Probable cause.* The defendant claims that the affidavit (see note 9 *supra*) did not establish the probable cause which is required before a magistrate may issue a search warrant. We disagree.

The strict requirements of reliability which govern an analysis of an anonymous informant's trustworthiness are relaxed with respect to named and identified sources. *Common-*

---

[9] We note that we have held, in similar circumstances, that "when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." *Commonwealth* v. *Young*, 382 Mass. 448, 457 (1981), quoting *Mincey* v. *Arizona*, 437 U.S. 385, 392 (1978). See *Michigan* v. *Tyler*, 436 U.S. 499, 509-510 (1978); *Warden, Md. Penitentiary* v. *Hayden*, 387 U.S. 294, 298-299 (1967).

See also *Commonwealth* v. *Forde*, 367 Mass. 798 (1975), where we identified a number of factors which tend to support a finding of exigency. They include "a showing that the crime was one of violence or that the suspect was armed, a clear demonstration of probable cause, strong reason to believe that the suspect was in the dwelling, and a likelihood that the suspect would escape if not apprehended. Additional considerations testing the reasonableness of police conduct are whether the entry is peaceable and whether the entry is in the nighttime." *Id.* at 807.

*wealth* v. *Burt,* 393 Mass. 703, 710 (1985). See *Commonwealth* v. *Atchue,* 393 Mass. 343, 347-348 (1984). The affidavit named Mac Brodie and identified him as an employee of the Boston Edison Company. "A serious charge . . . when volunteered by an identified party . . . carries with it indicia of reliability of the informant." *Commonwealth* v. *Atchue, supra* at 347, quoting *United States* v. *Wilson,* 479 F.2d 936, 940 (7th Cir. 1973).

The affidavit made clear that the basis of Brodie's detailed information was his personal observation of the backyard burial. See *Commonwealth* v. *Burt, supra.* See *Commonwealth* v. *Valdez,* 402 Mass. 65, 70 (1988). In addition, the discovery of the grave by the police, and their extrication of the victim, corroborated Brodie's observations, further establishing probable cause. See *Commonwealth* v. *Burt, supra* at 711.

c. *Particularity.* The defendant argues that the warrant did not identify adequately the items to be seized. We disagree.

The Fourth Amendment to the United States Constitution requires that warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." Article 14 of the Massachusetts Declaration of Rights requires warrants to be "accompanied with a special designation of the persons or objects of search, arrest, or seizure." General Laws c. 276, § 2, provides that search warrants "shall particularly describe the property or articles to be searched for."

The particularity requirement serves as a safeguard against general exploratory rummaging by the police through a person's belongings. See *Coolidge* v. *New Hampshire,* 403 U.S. 443, 467 (1971); *Stanford* v. *Texas,* 379 U.S. 476, 481-485 (1965); *Marron* v. *United States,* 275 U.S. 192, 196 (1927). "[I]t both defines and limits the scope of the search and seizure, thereby protecting individuals from general searches, which was the vice of the pre-Revolution writs of assistance." *Commonwealth* v. *Pope,* 354 Mass. 625, 629 (1968). "[T]he degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved." *United States* v. *Johnson,* 541 F.2d 1311, 1314 (8th Cir. 1976).

The police applied for the warrant immediately after discovering the body of the victim in the rear yard of the house to be searched. The police officers did not know what instrument had caused the victim's severe head wounds. Under these circumstances, the police could not be expected to describe with detailed precision the items to be seized when the exact characteristics of those items were not known to them. See *State* v. *Hodges*, 43 Or. App. 547 (1979); *United States* v. *Robinson*, 287 F. Supp. 245 (N.D. Ind. 1968). To hold otherwise would unreasonably thwart the ability of the police to investigate a crime immediately after its occurrence.

This case is distinguishable from *Commonwealth* v. *Taylor*, 383 Mass. 272 (1981), where we held that a warrant authorizing a search for "antique jewelry" in a jewelry store did not meet the particularity requirement. *Id.* at 275. In *Taylor*, unlike this case, "the particularization was available but was not used in the warrant." *Id.* at 276. The fact that the warrant listed blood and clothing made it reasonably clear that the "instrumentalities" sought were related to a crime of violence. The police officers in this case properly limited the scope of their search to the weapons used to inflict the victim's head injuries and to blood resulting from those injuries. Under the circumstances, the constitutional requirements were satisfied.

d. *Miscellaneous search and seizure issues.* (1) The police, during the search, took photographs of areas where blood was found, including the stove area and the kitchen closet. Since the police were legally on the premises, it was permissible for them to take these photographs. See *Commonwealth* v. *Young*, 382 Mass. 448, 459 (1981).

(2) The seizure of the defendant's bloodstained jeans did not violate the defendant's constitutional rights. The police took the defendant's jeans after he had been arrested and had been taken to the police station. "Once a defendant has been arrested and is in custody, clothing that constitutes evidence may be taken from him." *Commonwealth* v. *Gliniewicz*, 398 Mass. 744, 750 (1986).

(3) The warrant stated on its face, "You are therefore commanded . . . to search for the following property: 461 LaGrange

St. W. Rox. 2½ story white w/blk trim wooden dwelling." In the immediately preceding section — the warrant's preamble — the warrant listed "blood — clothing — or any other instrument used in crime." This misplacement does not invalidate the warrant. See *Commonwealth* v. *Truax*, 397 Mass. 174, 179-181 (1986). The warrant should be "read in a common-sense, not a hypertechnical, manner." *Id.* at 180. It is possible, without any great difficulty, "to determine what premises are to be searched and what items are sought." *Id.* at 181.

(4) The warrant's return stated that the search was conducted at "2:20 P.M." The judge, after a hearing on this issue, determined that this notation was a "mistake made in haste," and that the search actually was conducted some time after 3:15 P.M. Although we may independently review documentary facts, we see no reason to doubt the findings of the judge, who had the opportunity to weight the witness's credibility. See *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980).

The error in the return does not constitute ground for voiding the otherwise lawful search. *Commonwealth* v. *Cromer*, 365 Mass. 519, 521 n.3 (1974). *Commonwealth* v. *Aldrich*, 23 Mass. App. Ct. 157, 161-162 (1986). "Any requirement . . . of an accurate return 'is not closely affiliated with any constitutional guarantee' [*Commonwealth* v. *Lyons*, 397 Mass. 644, 648 (1986)] and can have no practical effect upon a warrant issued on an affidavit clearly establishing probable cause." *Commonwealth* v. *Aldrich, supra* at 162-163.

8. *Motion to dismiss indictment.* The defendant claims that certain statements made before the grand jury warranted dismissal of the indictment. We disagree.

The Commonwealth presented one witness, Detective William Fogerty, to the grand jury. During his testimony, Fogerty stated that when the defendant was questioned in the police station on the evening of May 14, 1986, he was informed of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 474 (1966). The prosecutor asked Fogerty whether there were "words stated by Mr. Freiberg thereafter that may be the sub-

ject of a controversy before a superior court judge." Fogerty replied, "Yes sir, I believe so."[10]

The defendant claims that this incident tainted the indictment. The judge found the contrary. But, even assuming that these vague remarks could somehow be construed to indicate that the defendant made inculpatory statements, "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted . . . on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination." *United States* v. *Calandra*, 414 U.S. 338, 345 (1974), citing *Lawn* v. *United States*, 355 U.S. 339 (1958). See *Commonwealth* v. *Santaniello*, 369 Mass. 606, 608 (1976).

The defendant has made no showing that the statements at the grand jury proceeding prejudiced his ability to obtain a fair trial. *Commonwealth* v. *Hine*, 393 Mass. 564, 572 (1984). The defendant's claim that the indictment should be dismissed because it was issued solely on the basis of hearsay evidence is without merit. *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 655 (1979). Mass. R. Crim. P. 4 (c), 378 Mass. 849 (1979).

9. *Scientific tests.* The defendant argues that the judge erroneously denied the defendant's motion to suppress evidence of the results of scientific testing conducted on the defendant's jeans.

The judge found the following facts. During the booking procedure at the station house in West Roxbury, the police seized the defendant's jeans after noticing red-brown stains on them. A criminalist at the Boston police crime laboratory removed and tested a 1/4-inch by 3/8-inch section of the jeans containing part of one of the stains. The test results suggested that the stain was type B human blood, consistent with the

---

[10] During the police interrogation in question, the defendant requested the presence of an attorney. A police officer said, "Okay. Just let me inform you that you are being charged with murder. Okay?" The defendant asked why, and the officer responded, "Well, because the girl is dead." The defendant stated, "She can't be dead." The officer described the victim's injuries, and the defendant responded with certain inculpatory statements. The judge held that this portion of the interrogation violated the defendant's rights under the principles stated in *Miranda* v. *Arizona, supra,* and he granted the defendant's motion to suppress the statements from being introduced in evidence at trial.

victim's blood type. An antigen test was inconclusive. The section tested was destroyed during the course of testing.

The judge determined that the defendant was not prejudiced by the Commonwealth's tests. Stains were available for comparable testing on other portions of the jeans, and the defendant did not avail himself of the opportunity to perform his own tests. Though the antigen test could no longer be performed, the Commonwealth's test had been inconclusive. There was no indication in the record of a claim of culpability on the part of the police. There was no error. See *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). Contrast *Commonwealth* v. *Olszewski*, 401 Mass. 749, 755-756 (1988).[11]

10. *Manslaughter*. The defendant claims that he was entitled to an instruction on manslaughter. "[I]f any view of the evidence will permit a finding that the offense was manslaughter, the judge must charge on manslaughter." *Commonwealth* v. *Pitts*, 403 Mass. 665, 667 (1989), quoting *Commonwealth* v. *Garabedian*, 399 Mass. 304, 313 (1987).

"Voluntary 'manslaughter . . . [is] a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat.' " *Commonwealth* v. *Pitts, supra* at 667, quoting *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1980). There was no evidence presented that would have warranted a charge on voluntary manslaughter. Neither Lincoln nor Hurley, who were seated outside of the kitchen either just before or while the defendant hit the victim's head against the stove, testified to any argument or altercation which would constitute reasonable provocation or would tend to show that the defendant had undergone a "sudden transport of passion." The jury may not engage in speculation in the absence of any evidence of manslaughter. *Commonwealth* v. *Benoit*, 389 Mass. 411, 424 (1983).

Similarly, a charge on involuntary manslaughter was not required by the evidence. There was no evidence that the vic-

---

[11] *Commonwealth* v. *Gliniewicz*, 398 Mass. 744 (1986), is not on point. That case involved the failure of the Commonwealth to meet its obligations under a pretrial conference report pursuant to Mass. R. Crim. P. 11(a) (2) (A), 378 Mass. 862 (1979). *Commonwealth* v. *Gliniewicz, supra* at 747. In this case, the testing occurred before the parties entered into a pretrial agreement.

tim's death was "unintentionally caused by an act which constitute[d] such a disregard of probable harmful consequences to another as to amount to wanton or reckless conduct." *Commonwealth* v. *Walden, supra* at 730, quoting *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 747 (1975). Cf. *Commonwealth* v. *Sheppard*, 404 Mass. 774, 777 (1989).

11. *Charge on intoxication.* The defendant claims that the judge's failure to use the exact language of *Commonwealth* v. *Delle Chiaie*, 323 Mass. 615, 617 (1949), or in his charge to the jury on intoxication, constituted reversible error. We disagree.

The judge's charge sufficiently apprised the jury that they should consider evidence of intoxication in determining whether the defendant was capable of deliberate premeditation. We have never required that the exact language of *Delle Chiaie* be used. At any rate, as the jury acquitted the defendant of premeditated murder, there could be no prejudice to the defendant.

12. *Charge on credibility.* We disagree with the defendant's argument that the judge should have used the specific language of *Commonwealth* v. *Snow*, 111 Mass. 411, 417 (1873), in his charge on credibility. The judge's charge on credibility adequately informed the jury of the law on that subject.[12] See *Commonwealth* v. *Perez*, 390 Mass. 308, 314

---

[12] The judge charged as follows:

"[Y]ou may have to determine the truthfulness, the credibility, of the various witnesses who testified before you under oath, because you have to decide the weight that you wish to accord, that you wish to give to each witness's testimony. You are the sole judges of the credibility or the believability of the witnesses. If there's any conflict in the testimony, if the testimony doesn't jibe, it's your function to resolve the conflict and determine the truth. . . . [I]f you determine that a witness made a statement which is different from the way he testified in court, you may consider that in evaluating his credibility. You may consider it to be a minor inconsistency or major inconsistency; you may use it for whatever value you think it reflects upon his credibility, his believability. . . . [Y]ou're not bound by the opinion of an expert; you can believe it or disbelieve it. You can give it whatever weight in your judgment it is fairly entitled to receive. You can believe all of it, you can believe some of it, you can believe none of it. You assess the credibility of witnesses. That's for all witnesses."

(1983); *Commonwealth* v. *Clary*, 388 Mass. 583, 589 (1983); *Commonwealth* v. *McInerney*, 373 Mass. 136, 143-144 (1977).

13. *Evidentiary issues.* a. *Expert testimony.* The defendant challenges the foundation of an opinion given by Dr. Leonard Atkins, the medical examiner who performed the autopsy. After examining two exhibits, namely, photographs of the kitchen stove, Dr. Atkins answered "Yes" to the following question: "Directing your attention to the lefthand upper side of the stove as it's portrayed in [the photographs], are the injuries that you observed on Lisa Margil consistent with her head being banged against the upper portion of the lefthand side of that stove?"

The testimony was admissible. "An expert who has performed an autopsy may testify that the injuries observed could have been caused in a particular way or by a specified instrumentality." *Commonwealth* v. *Pikul*, 400 Mass. 550, 554 (1987). The photographs of the stove, together with the physician's personal observations of the victim, constituted a sufficient basis for the physician to testify that the victim's injuries could have been caused by the stove. See *Commonwealth* v. *Pikul, supra*; *Commonwealth* v. *Campbell*, 378 Mass. 680, 704 (1979).

b. *Motive.* The defendant challenges the admissibility of certain evidence, including evidence of the victim's state of mind, which the Commonwealth introduced to establish motive. There was testimony that the defendant had borrowed a large amount of money from the victim, representing to her that it was to be used to finance a trip they were to take together. There was also testimony that the defendant had used the money to purchase a motorcycle without telling the victim, and that the defendant, the day of the victim's death, had silenced his friends' discussion of the motorcycle when the victim was present. When asked what he would do if the victim discovered his purchase, the defendant "said he'd kill her." There was evidence presented that the victim went to the defendant's home on the day of her death in order to insist that he return the money. The victim's father testified that the victim had said, "I won't come back until I get the money."

"Although the Commonwealth is not required to prove that a defendant had a motive for committing a crime, if there is evidence of motive, that evidence is admissible." *Commonwealth* v. *Borodine*, 371 Mass. 1, 8 (1976). There was sufficient evidence presented for the jury to infer the defendant's motive for killing the victim. See *id*. Cf. *Commonwealth* v. *Olszewski*, 401 Mass. 749, 759 (1988).

c. *Admission of 911 tape recording*. The judge twice allowed the Commonwealth to play a tape recording of the two 911 telephone calls. The judge allowed the second playing in order for Hurley to identify the defendant's voice. The defendant claims that the second playing was prejudicially inflammatory. "Whether such evidence was so inflammatory in nature as to outweigh its probative value and preclude its admission is a question to be determined by the trial judge in the exercise of his sound discretion." *Commonwealth* v. *Hodge (No. 2)*, 380 Mass. 858, 863 (1980), quoting *Commonwealth* v. *D'Agostino*, 344 Mass. 276, 279, cert. denied, 371 U.S. 852 (1962). "[T]he occasions for exclusion on just that ground have been rare indeed." *Commonwealth* v. *Hodge, supra*, quoting *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 817 (1973). The judge did not abuse his discretion. Because the tapes were admitted in evidence, the jury were free to listen to them as often as they pleased during deliberations. There was no error.

d. *Photographs*. The judge did not err in admitting photographs of the victim's head injuries. "This court has held without exception in a long line of decisions that in a case such as the present one, involving an indictment charging murder in the first degree which is being tried on the basis, among others, that it was committed 'with extreme atrocity or cruelty,' photographs . . . indicating the force applied and portraying the injuries inflicted may properly be admitted on the issue of 'extreme atrocity or cruelty.'" *Commonwealth* v. *Bys*, 370 Mass. 350, 358 (1976), and cases cited.

14. *Section 33E*. On review of the entire record and transcript pursuant to G.L. c. 278, § 33E (1986 ed.), we are not

persuaded that the interests of justice demand a new trial or the entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*

*Order denying motion for new trial affirmed.*