COMMONWEALTH *vs.* PRESTON YANCY, SR.

Essex. September 8, 2003. - October 21, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Homicide. Intent. Mental Impairment. Intoxication. Evidence,* Intent, Intoxication. *Constitutional Law,* Assistance of counsel. *Practice, Criminal,* Capital case, Assistance of counsel, Instructions to jury. *Witness,* Expert, Unavailability.

At a murder trial, counsel's failure to call a certain witness did not deny the defendant effective assistance of counsel, where the witness would not have aided the defense in any significant way, and might have harmed it in some ways. [239-244]

At a murder trial, the judge properly instructed the jury that they could consider "diminished capacity" both as to deliberate premeditation and malice aforethought, to wit, that they could consider the defendant's mental condition on the day in question, including mental impairment, if any, or voluntary intoxication from the use of alcohol or drugs, if any; the judge was not required to use the precise language of *Commonwealth* v. *Delle Chiaie,* 323 Mass. 615, 617 (1949), in delivering the charge. [244]

INDICTMENTS found and returned in the Superior Court Department on November 23, 1994.

The cases were tried before *Robert A. Barton,* J., and a motion for a new trial, filed on October 10, 2000, was heard by *Howard J. Whitehead,* J.

*William J. Leahy,* Committee for Public Counsel Services (*Lisa Ann Grant,* Committee for Public Counsel Services, with him) for the defendant.

*Gregory I. Massing,* Assistant District Attorney (*Jean M. Curran,* Assistant District Attorney, with him) for the Commonwealth.

SPINA, J. The defendant was convicted of deliberately premeditating the murder of his girl friend, Diane Aleksa, and his estranged wife, Sylvia Ann Holland Yancy, on November 6,

1994, in Lynn.[1] The defense was lack of capacity to specifically intend and deliberately premeditate the killings. The defendant filed a motion for a new trial in which he alleged that trial counsel's failure to call Dr. Thomas C. Hill, a neuroradiologist who performed a single photon emission computerized tomography (SPECT) scan of the defendant's brain, to testify about the defendant's organic brain defect, "denuded [him] of a defense" and thereby denied him the effective assistance of counsel under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. The trial judge had retired, and the motion for a new trial was heard by a different judge, who denied the motion. The defendant appealed from the denial of his motion for a new trial, which has been consolidated with this direct appeal. On appeal, the defendant argues that he is entitled to a new trial either because he was denied the effective assistance of counsel, or because the judge's instructions on mental impairment were inadequate. In the alternative, he asks us to exercise our power under G. L. c. 278, § 33E, to reduce the convictions to murder in the second degree. We affirm the convictions and decline to reduce them. We also affirm the denial of the defendant's motion for a new trial.

1. *Background.* The defendant did not contest the fact that he shot the victims. The focus of the defense at trial was that, because of an organic brain defect and intoxication by alcohol and drugs, there was a reasonable doubt that the defendant had the capacity deliberately to premeditate or to form the specific intent to kill. Defense counsel elicited or stressed evidence to support the defense, and he called a forensic psychiatrist to give opinion testimony.

By early November, 1994, the defendant had been separated from his wife for approximately six months, and he was living with his girl friend. The wife and girl friend lived within five blocks of one another in Lynn. The defendant had a long-standing problem with alcohol. He had been using cocaine for about one year, and on occasion he would take Valium or use

---

[1] The trial judge allowed motions for a required finding of not guilty as to indictments alleging assault by means of a dangerous weapon and possession of a shotgun.

marijuana. Because he had been drinking heavily, the defendant had been unable to work for several days at the two jobs he held, one as a cook and the other as a janitor. The defendant was prone to depression and mood swings. He had suffered a serious head injury in the past.

At approximately noon on Saturday, November 5, the defendant telephoned his cousin, Donald, and asked for help. Donald went to the defendant's apartment, where he found the defendant intoxicated, crying, and contemplating suicide. Donald saw an assortment of drugs in plain view. They went out for a ride, and Donald agreed to take the defendant to a detoxification center the following Monday.

The two men then went to the apartment shared by their mothers. The defendant told his mother that he was going to get help and that he wanted her to hold his insurance papers until he returned from treatment. The defendant's daughter visited her grandmother while the defendant was there. She took a walk with the defendant, and he told her that he was tired of living and intended to kill himself. She asked him, "What about us?," referring to herself, her brother, her mother, and the defendant's girl friend. The defendant replied that he was going to take them with him.

During the early morning hours of Sunday, November 6, 1994, the defendant argued with his girl friend over whether he should leave to enter a detoxification program. In the course of that argument she sustained seven blunt force injuries to the head, and a single gunshot to the head that likely caused her death instantaneously. The defendant neatly covered her body with a blanket, and placed a stuffed animal, two notes, and a black silk rose next to her. One note said, "Nobody cared about . . . Diane Mary Aleksa except for Preston J. Yancy. I will see her and reunite in heaven because we lived in hell on this earth." The other note said, "I could not live without her. If I went for help she would leave me. We fought. I hurt her and refuse to go back behind the wall. . . . She will be cremated with the rest of my family." The second note also stated, "Insurance will be handled by my mother and [cousin Donald]," and indicated that information concerning Diane's bank account was beside her body. He made an entry on a calendar in the apartment for November 6 that stated, "Me Diane and Family Died."

The defendant then went to his wife's apartment. He brought the .22 caliber rifle he had used to shoot his girl friend, and arrived shortly before 9 A.M. on November 6. His son, who was then a junior in high school, talked with the defendant, who seemed "himself." The defendant told his son that he had killed Diane Aleksa. The defendant's wife told him that he could not stay at her apartment because she did not need any trouble. He pleaded that he had nowhere to go, and asked if he should kill himself on the spot. His son had to leave for work by 9:30 A.M., and, as he walked toward the door, the defendant handed him fifty-six dollars and said, "Take this. Where I'm going I'm not going to need it." He also gave his son a bag with two envelopes containing a will and insurance papers to bring to the defendant's mother. The words "Cremation please, all 5 of us" were written on one of the envelopes. The son stopped at his grandmother's apartment on his way to work and gave her the bag.

The defendant's fourteen year old daughter was also at his wife's apartment, but was asleep when he arrived. She was awakened shortly after 9:30 A.M. by the sounds of a struggle between her parents. She walked into the hall and saw her mother trying to take a rifle from the defendant. He was saying, "No. No. I have to do it." The defendant's daughter retreated to her room, then heard a gunshot. The defendant had shot his wife twice in the chest, killing her. A few seconds later, the defendant entered his daughter's room with the rifle. His daughter begged him not to kill her. He said, "I guess you're right. Might as well just kill myself [because] I already killed Diane." He left her room and then shot himself in the chest. The defendant's daughter telephoned her grandmother and told her what happened. The grandmother telephoned the police.

Police and paramedics arrived at the apartment and found the defendant lying beside his wife. The defendant was alive, but in shock. He was given intravenous fluid and his condition began to improve. He was placed on a stretcher and taken to a hospital by ambulance. He was alert and oriented, and he responded appropriately to questions about his condition.

In the ambulance the defendant told a paramedic that there was a second victim. He asked the police officer who was accompanying them about the condition of his girl friend. The of-

ficer asked what he was talking about, because the officer knew the defendant and knew him to be married. The defendant said that he shot his girl friend and suggested that some police officers be sent to her apartment. The officer immediately advised the defendant of his Miranda rights. The defendant acknowledged that he understood and indicated that he wanted to continue talking. He said he had argued with his girl friend over whether he should enter a detoxification program. He said that she started hitting him with a club,[2] so he went into the next room, returned with a rifle, and shot her in the head. He said he took his rifle to his wife's apartment and asked for help. When she refused and threatened to telephone the police, he shot her also. When the defendant heard the officer give an incorrect address for his girl friend over the police radio, he corrected the officer.

The defendant underwent two surgical procedures and remained in the hospital nearly three weeks. At the time of his admission to the hospital, blood tests were positive for cocaine and benzodiazepine (Valium), and his blood alcohol level was 0.05. Hospital records indicate he told a nurse that he had had twelve beers in the previous twenty-four hours. While at the hospital, the defendant was under a suicide watch and under the care of two psychiatrists. He experienced a seizure and a delusional episode at the hospital. He also experienced a seizure at the house of correction to which he was later transferred.

Dr. Harold Bursztajn, a forensic psychiatrist and senior faculty member at Harvard Medical School, testified that in his opinion the defendant was unable to formulate a specific intent to kill either victim or to premeditate the killings. His opinion was based on his interviews with the defendant and his review of the police reports, the defendant's notes, the defendant's hospital records for the three weeks after the killings, records from the house of correction where the defendant was being held, rec-

---

[2]There was no question of self-defense in this case. In response to a question from the trial judge, defense counsel's assessment of the case was that the only viable defense was to persuade the jury that there was a reasonable doubt as to the defendant's capacity specifically to intend to kill the victims or to premeditate the killings.

ords of Bridgewater State Hospital, and the SPECT scan report[3] of Dr. Thomas C. Hill, a neuroradiologist. Dr. Bursztajn testified that in his opinion "there is an abnormality in the right temporal lobe [of the defendant's brain] . . . in the area of the mesiotemporal lobe where you have connections from the hippocampus, the amygdala going up to the cortex." He testified that a person with this type of abnormality who consumed alcohol, cocaine, and Valium would likely experience a "partial complex seizure" and psychoses that would cause him "to either freeze, underreact or overreact to a perceived stress[ful]" situation such as the arguments the defendant had with his wife and girl friend. This type of abnormality would also reduce a person's ability to process information and make judgments about what is right and wrong.

Dr. Hill's report, which was admitted in evidence, also indicated that the defendant had an organic brain disorder, namely, "frontal lobe abnormalities bilaterally," that corresponded with "areas of decreased activity in the frontal lobes." In addition, the Hill report described "a right temporal lobe abnormality . . . [that] involve[s] the mesiotemporal cortex," consistent with the defendant's history of head trauma and a known seizure disorder. Dr. Hill did not testify, but Dr. Bursztajn, who ordered and attended the SPECT scan, compared transparencies of the defendant's SPECT scan to scan transparencies of a normal brain to illustrate the part of the brain affected, as support for his testimony about the behavioral manifestations of the decreased brain activity appearing in the SPECT scan results. In rebuttal, the Commonwealth called Dr. Martin Kelly, a forensic psychiatrist, who testified that, in his opinion, the defendant had the capacity both to intend and to premeditate the killings.

2. *Assistance of counsel.* The defendant argues that he was denied effective assistance of counsel because his trial counsel

---

[3]Dr. Bursztajn made certain observations about the defendant that suggested a possible frontal lobe disorder. He recommended that a SPECT scan of the defendant's brain be done by Dr. Hill. Dr. Bursztajn explained that the SPECT scan involved injecting the defendant with a harmless radioactive substance, then recording the blood flow through his brain by means of "computerized tomography." Dr. Hill's report indicated that the SPECT scan detected areas of decreased activity in the defendant's brain.

failed to call Dr. Hill, whose testimony was necessary to the proper presentation of his defense, and that such failure deprived him of a substantial ground of defense. At the hearing on the defendant's motion for a new trial, counsel testified that he engaged Dr. Hill to perform a SPECT scan of the defendant's brain based on the recommendation of Dr. Bursztajn, who said that it might produce relevant information on the issue of the defendant's mental capacity. Counsel had met with Dr. Bursztajn at least fifteen times to prepare for trial. Part of that preparation included the testing done by Dr. Hill. There is no suggestion that counsel ever discussed the defendant's SPECT scan results with Dr. Hill, but Dr. Bursztajn had discussed the defendant's SPECT scan with Dr. Hill. Counsel had intended to call Dr. Hill to testify about the SPECT scan, but learned on the eve of trial that Dr. Hill would not be available to testify because of a planned vacation in Florida. Counsel did not request a continuance of the trial based on this development. Counsel offered no tactical reason for proceeding without Dr. Hill, except to say, "[M]y main focus was Doctor Bursztajn['s] testifying before the jury about [the defendant's] mental state, which I thought was what the case was all about, and Doctor Hill's SPECT test was a vehicle to get us to Doctor Bursztajn's testimony."

The defendant argues that the failure to call Dr. Hill left the burden of presenting the SPECT scan evidence to Dr. Bursztajn, who was not qualified to make that presentation, and his presentation was unimpressive. He further contends that Dr. Bursztajn failed in three particular areas that would have benefited from Dr. Hill's testimony, namely: (1) he failed to offer any evidence of the frontal lobe abnormalities of the defendant's brain, which the defendant contends is "the seat of man's cognitive powers"; (2) he failed to present evidence that the defendant's temporal lobe abnormality was "unusual, unexpected, and dramatic," and that such abnormalities appear much more frequently in persons who suffer seizures and psychiatric disorders; and (3) even if Dr. Hill had testified only on surrebuttal, he could have refuted virtually everything said by Dr. Kelly that downplayed the significance of SPECT scans.

Our review under G. L. c. 278, § 33E, of claims of ineffec-

tive assistance of counsel is more favorable to a defendant than the constitutional standard of review of such claims. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). We consider "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Id.* Because there was no tactical basis for counsel's decision not to call Dr. Hill or to seek a continuance of the trial to a time when he would be available to testify, we do not apply the "manifestly unreasonable" test. See *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978).

Although Dr. Bursztajn did not offer any evidence on the defendant's frontal lobe abnormalities, Dr. Hill's testimony would not have aided the defense in any of the ways asserted. Dr. Hill was admittedly not a psychiatrist, and during the hearing on the motion for a new trial, he resisted every effort to elicit an opinion as to how such an abnormality might affect the defendant's behavior. He described the defendant's frontal lobe abnormalities as "subtle" or "small."

At the hearing on the motion for a new trial, Dr. Hill agreed that the defendant's temporal lobe abnormality was "dramatic," but when asked to elaborate, he would not and said, "[T]here's diminished neuronal activity or neuronal function in that temporal lobe. Making the leap to human behavior is not my field of expertise." He also indicated that research in the field is still in its early stages, and that "[o]ur work actually shows that it is rather individual and that not all of us use the same area of the brain for each cognitive task." It was, in fact, Dr. Bursztajn, the psychiatrist, who took this material and transformed it into material that was useful to the defense. The claimed correlation that Dr. Hill could have made between temporal lobe abnormalities and seizure activity was contained in his SPECT scan report that was admitted as an exhibit, and was specific to the defendant.

The defendant seizes on what he describes as Dr. Hill's "ultimate conclusion," where he said, "[F]rom what I can see, there is a reasonable expectation that his seizure activity contributed to his behavior. I can't say that with absolute medical certainty, but there's surely a doubt that his behavior wasn't

normal, and that this abnormality in his brain could be associated with this abnormal behavior." Dr. Hill did not testify that the defendant had an organic brain defect that impaired his capacity to deliberately premeditate or specifically to intend the killings. Earlier, when asked if he had an opinion whether the condition of the defendant's temporal lobe was associated with violent behavior, he said he had no opinion. When asked whether he had an opinion as to whether the abnormality could be associated with seizure episodes, he said he did not know, and testified as quoted above. He was answering a question about epilepsy and the defendant's behavior generally, not the circumstances surrounding the killings specifically.

Dr. Hill's testimony would have added little to rebut the testimony of Dr. Kelly. Although he would have contradicted Dr. Kelly's testimony that SPECT was an "older" technology involving lupus diagnoses with testimony that it was an "emerging" technology and that lupus research was not its principal use, it would have added nothing significant. Dr. Bursztajn's testimony was more to the point. Dr. Bursztajn had testified on cross-examination that, although SPECT technology had been in use for a number of years, "in the past two years it has become . . . more and more reliable in terms of the kinds of isotopes that you use to administer and, also, there has been more and more studies done correlating psychiatric and neuropsychiatric tests scanning." Dr. Bursztajn also teaches about the uses of SPECT scans in the field of psychiatry, and the comprehensive and fluid nature of his testimony evidenced familiarity with the technique.

Dr. Kelly testified that the SPECT scan did not show any damage to the defendant's hippocampus or amygdala, although "they were a little out of focus." Dr. Bursztajn had testified that the scan revealed a lesion "in the area of the mesiotemporal lobe where you have connections from the hippocampus, and the amygdala going up to the cortex." Dr. Hill would have testified that those portions of the brain do not appear on the scan. Dr. Kelly did not directly contradict Dr. Bursztajn, but Dr. Hill clearly would have contradicted both, and in the process he could have caused more damage to the defense.

Dr. Kelly testified that the mesiotemporal area of the brain

concerns either visual or musical memory or speech and language memory. He thus contradicted Dr. Bursztajn, who testified that this area served numerous functions, including the normal processing of visual and auditory stimuli, but also judgment and emotional memory. Dr. Hill would have offered some support for Dr. Bursztajn's anatomical testimony, but he resisted giving an opinion as to how any particular person's brain functioned. He therefore would have added nothing significant on this point.

Dr. Bursztajn gave extensive testimony about the result of the SPECT scan of the defendant's brain. The largest portion of his testimony involved brain anatomy and psychiatry, and he made use of Dr. Hill's SPECT scan results and the SPECT scan transparencies to support that testimony. Dr. Bursztajn acknowledged that he was not an expert in reading SPECT scans. In that regard, however, he pointed out that, like the primary care physician who relies on the reports of a radiologist, the forensic psychiatrist relies on the reports of the neuro-radiologist to assist in the diagnosis and treatment of conditions that are not visually apparent. He also indicated that his teachings include the use of SPECT scans in psychiatry. He. was entitled to rely on the SPECT scan report as a basis for his opinion. Although not an expert in SPECT scan technology, he was sufficiently familiar with it to offer testimony about its use in psychiatry. Other contentions about his testimony do not merit discussion. Contrary to the defendant's assertion, Dr. Bursztajn's SPECT scan testimony was appropriate.

Finally, there is no merit to the criticism of Dr. Bursztajn for his use of colloquialisms like "cold spot," "hot spot," and "emotional thermostat" to explain complex medical and psychiatric concepts. The fact that both Dr. Hill and Dr. Kelly were critical of such use does not make them ineffectual teaching aids for the jury. It is apparent from the record that Dr. Bursztajn was apologetic for their use, but he proceeded to use them in an attempt to make his testimony more accessible to the jury.

We conclude that counsel's failure to call Dr. Hill to testify probably would not have affected the verdicts, and that there was no error in the denial of the defendant's motion for a new

trial. We add that, where there were multiple expressions of an intent to kill and unmistakable indicia of planning (references to insurance, cremation, taking the whole family with him), expert opinion that the defendant was incapable of intending or premeditating what he obviously did was unlikely to create a reasonable doubt.

3. *Jury instructions.* The defendant claims that the jury instructions on "diminished capacity" were inadequate. There was no objection, so we review under G. L. c. 278, § 33E, to determine whether any error in the instructions created a substantial likelihood of a miscarriage of justice. We have reviewed the instructions, and conclude that the jury were properly instructed that they could consider "diminished capacity" both as to deliberate premeditation and malice aforethought, conformably with *Commonwealth* v. *Grey*, 399 Mass. 469 (1987), and *Commonwealth* v. *Gould*, 380 Mass. 672, 680-683 (1980). The judge instructed the jury that they could consider the defendant's mental condition on the day in question, including mental impairment, if any, or voluntary intoxication from the use of alcohol or drugs, if any. The defendant contends that the charge was defective because the judge did not use the precise language used in *Commonwealth* v. *Delle Chiaie*, 323 Mass. 615, 617 (1949). The precise *Delle Chiaie* language is not required. See *Commonwealth* v. *Freiberg*, 405 Mass. 282, 303, cert. denied, 493 U.S. 940 (1989). There was no error.

4. *General Laws c. 278, § 33E, review.* We have reviewed the transcripts, the entire record, and the briefs, and conclude that neither a reduction of the convictions nor a new trial is warranted. There was considerable evidence of reflection before killing.

*Judgments affirmed.*

*Order denying motion*
*for a new trial affirmed.*